UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | |
|---|---|
| HOWARD WERT and JOANN WERT, ) | |
| ) | |
|     Plaintiffs, ) | |
| ) | No. 3:04-1094 |
| v. ) | Judge Echols |
| ) | |
| LA QUINTA INNS, INC., ) | |
| ) | |
|     Defendant. ) | |

## MEMORANDUM

Pending before the Court are Defendant's Motion In Limine to Exclude the Testimony of Elizabeth Bisgard, M.D. (Docket Entry No. 59), Plaintiffs' Motion for Sanctions for Spoliation of Evidence (Docket Entry No. 87), and Defendant's Motion for Summary Judgment (Docket Entry No. 55). The parties fully briefed these motions.

## I. FACTS

Plaintiff Howard Wert and his wife, JoAnn Wert, who are Colorado residents, were guests at a La Quinta Inn in Nashville, Tennessee, on November 10, 2003. Howard Wert alleges that, while he was in the shower, the fiberglass floor gave way and he fell, injuring his back. The Werts allege that the shower floor had cracked previously, but the hotel did not replace the shower floor or support the area beneath the cracks. Rather, the hotel attempted to patch the floor and placed a bath mat over the cracks to hide them. Mrs. Wert took photographs of the shower floor as it purportedly existed after her husband fell. (Docket Entry No. 87, Ex. E.) Defendant denied that any repair was ever done and asserts it had no notice of any alleged defect in the Plaintiffs' hotel room.

Mr. Wert talked with hotel General Manager Catherine Luiz about his fall and asked her to sign a statement about what occurred, but she refused to do so. Ms. Luiz characterized Mr. Wert

as a very large man and thought he was trying to be intimidating. She offered Mr. Wert medical care, but he refused it. Ms. Luiz completed a "Notice of Loss" report while Mr. Wert was present and she also completed a "Guest Incident Report" and sent it to the corporate office the next day. The Werts moved to a different hotel in Nashville and completed their stay before returning to Colorado.

Mr. Wert had had two lower back surgeries before he fell in the shower at the La Quinta Inn on November 10, 2003. Upon returning home, Mr. Wert was medically treated for back pain and ultimately had two additional lower back surgeries in 2004 and 2005.

The Werts claim that Defendant La Quinta Inns, Inc., should be found liable in negligence as a result of Mr. Wert's fall. They seek damages for medical expenses of approximately $500,000, pain and suffering, lost wages, and Mrs. Wert's loss of consortium. The case is scheduled for a bench trial before this Court.

## II. MOTION IN LIMINE CONCERNING ELIZABETH BISGARD, M.D.

Defendant seeks to exclude the testimony of Elizabeth Bisgard, M.D., one of Howard Wert's treating physicians. Defendant claims that Dr. Bisgard, a specialist in occupational medicine, is not qualified by knowledge, skill, experience, training, or education pursuant to Federal Rule of Evidence 702 to offer her proposed opinion testimony on the causation of Mr. Wert's injuries and his alleged need for surgery following the November 2003 fall. Defendant points out that Dr. Bisgard completed one month of a surgical residency, she works only in the field of occupational medicine, and she did not complete any training and does not hold any license or certification in orthopedics or spinal surgery. If the Court does not exclude her testimony, Defendant requests a hearing under Daubert v. Merrill Dow Pharmaceuticals, Inc., 509 U.S. 579, 589 (1993).

2

Dr. Bisgard testified that she trained as a surgical intern for one year and as a surgical resident for two months, for a total of 14 months, before she decided she did not wish to be a surgeon and ended her surgical residency in September 1994. (Docket Entry No. 59-2, Bisgard Depo. at 12-13.) Dr. Bisgard then obtained a Colorado medical license and practiced for six years from September 1994 to May 2000 as a Staff Physician in occupational medicine at clinics run by Concentra Medical Centers in Colorado. During that time she obtained a Master's degree in Public Health by correspondence from the Medical College of Wisconsin. From June 2000 to the present she has been employed as a Staff Physician and Medical Director of Employee Health for HealthOne Occupational Medicine in Colorado. She completed a residency in occupational medicine from July 2000 to June 2001 by commuting from Colorado to the University of Pennsylvania Medical Center several days per month. (Id. at 14-15.) She has been board certified in occupational medicine since 2002 and has held Division of Workers' Compensation Level II accreditation in Colorado since 1995, which permits her to perform independent medical examinations. (Id. at 16-19.) She has been a member of the American College of Occupational and Environmental Medicine since 1995. (Depo. Ex. 1, CV.) She qualified as an expert witness on causation in thirty-eight (38) cases between 1996 and 2007.[1] (Docket Entry No. 71-2, Bisgard Aff. ¶ 9, Ex. A.)

Dr. Bisgard's area of expertise is the assessment, diagnosis, treatment, and prevention of occupational injuries and illnesses. Her medical practice includes urgent care and acute trauma, lacerations, fractures, toxic exposures, blood-borne pathogen exposures and other occupationally related injuries and/or illnesses. She does not practice general internal medicine or engage in family

---

[1] The Court has not considered the Affidavit of William W. Greaves, MD, MSPH (Docket Entry No. 71-3), which Plaintiffs submitted in an attempt to bolster Dr. Bisgard's credentials.

practice. She is required to determine causation with every injury and evaluation, and part of her Level II accreditation required her to pass a written examination on "Causality Assessment." Dr. Bisgard sees an average of 22 to 25 patients per day, four days per week. In 2006, she saw at least 212 patients with reported back pain and in each of those cases she was required to address the cause of the back pain. She attests that determining the cause of lumbar injury does not require board certification in orthopedics or spine surgery training. (Docket Entry No. 71-2, Bisgard Aff. ¶¶ 5, 8, 10-15, 18.)

Mr. Wert has been under Dr. Bisgard's care since November 17, 2003, when Mr. Wert's employer, Xcel Energy, referred him to her because she is the designated treatment provider for Xcel Energy. (Id. at ¶¶ 6-7.) In determining the cause of Mr. Wert's lumbar injury, she relied on her examination of him, diagnostics, and history he provided. She also reviewed his past medical records. (Id. at ¶ 19.) During the course of treatment, Dr. Bisgard examined Mr. Wert thirty-six (36) times, which included inspection and palpation of his spine, review of x-rays, and neurological evaluation of his lower extremities. (Id. at ¶ 21.)

Dr. Bisgard attests that she believes she is qualified to render an opinion on the issue of causation in Mr. Wert's case based on her education, training, and experience. (Id. at ¶ 20.) Based on a reasonable degree of medical probability and certainty, it is her opinion that the fall in the shower on November 10, 2003 did not cause Mr. Wert's degenerative scoliosis, lumbar spinal stenosis, advanced degenerative disk disease, and lumbar spondylosis, but that the fall permanently aggravated Mr. Wert's conditions causing the need for spinal surgeries in 2004 and 2005. In her opinion, but for the fall, Mr. Wert more probably than not would not have needed the two spine surgeries in 2004 and 2005. (Id. ¶¶ 25-30.)

4

Plaintiffs correctly observe that the Daubert "gatekeeping" function assigned to this Court is calculated to protect juries from misleading or unreliable expert testimony and "is largely irrelevant in the context of a bench trial." Deal v. Hamilton County Bd. of Educ., 392 F.3d 840, 852 (6th Cir. 2004); United States v. Demjanjuk, 367 F.3d 623, 634 (6th Cir. 2004) (observing the issue of whether a witness is qualified to testify as an expert is left to the sound discretion of the trial judge, particularly so in a bench trial). The Court is not required to hold a hearing to comply with Daubert; rather, the Court must make an initial assessment of the relevance and reliability of the expert testimony. See Greenwell v. Boatwright, 184 F.3d 492, 498 (6th Cir. 1999).

The Court concludes that Plaintiffs have made a sufficient initial showing of the relevance and reliability of Dr. Bisgard's testimony to permit her to testify as a treating physician and expert on the issue of causation at the bench trial. It appears from the record that Dr. Bisgard's trial testimony will be presented by deposition. Defendant should have had ample opportunity at the deposition to cross-examine Dr. Bisgard in an effort to persuade the Court as to the weight the Court should give to Dr. Bisgard's testimony and opinions. See Daubert, 509 U.S. at 596 ("vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence.") The Court does not believe that it will abuse its discretion in admitting Dr. Bisgard's testimony. See General Elec. Co. v. Joiner, 522 U.S. 136, 141 (1997); Demjanjuk, 367 F.3d at 633. Defendant's Motion in Limine to exclude the testimony of Dr. Bisgard will be denied.

5

## III. MOTION FOR SANCTIONS FOR SPOLIATION OF EVIDENCE

La Quinta Inn General Manager Catherine Luiz sent a "Guest Incident Report" to Defendant's corporate office on November 11, 2003, describing Mr. Wert's fall in the shower the previous day. On the second page of the report, Ms. Luiz wrote:

> Room was comped for one night. Guest attempted to force manager to write a statement about what had happened and sign it. I of course refused as I did not witness anything. Attempted to get guest to see a doctor, he refused medical care. Is in town a few more days at the Embassy Suites for a seminar. He took my business card and I told him to call me if the pain worsened.
> He made me very cautious when he started demanding I write something down, this one may be worth watching.
> Room is out of order pending repairs.

(Docket Entry No. 87, Ex. 5 at 2.) At her deposition, Ms. Luiz testified that Mr. Wert's demand that she write something down about the incident "threw up red flags that this guy might be trying to do something sneaky." (Docket Entry No. 87-11, Ex. L.) Ms. Luiz further testified that, when she went to the room, she saw only one small crack in the shower floor near the drain and she did not see any discoloration on the shower floor indicating a previous repair attempt. (Docket Entry No. 87-6 & 87-7, Exs. G & H.) She determined "we couldn't keep it like that, not for guest safety or for the fact that water would have drained under there and molded." (Docket Entry No. 87-6, Ex. G.) She did not take any photographs of the shower floor, even though Defendant encourages its managers to have a camera on site and take photos if they would better convey the circumstances of an accident on the property. (Docket Entry No. 87-8, Ex. I, Rhodes Depo. at 45.)

Sometime after turning in the Guest Incident Report, Ms. Luiz directed the hotel maintenance man to tear out the shower stall and dispose of it in the dumpster at the hotel. (Docket Entry No. 87-5 & 87-6, Exs. F & G.) She did not make any attempts to preserve the shower floor, she did not have anyone else inspect it, and she did not take any measurements. She did not contact the

6

corporate office for advice before directing the maintenance man to dispose of the shower floor. (Id.)  The maintenance man, Samuel Mendez, reportedly returned to Mexico and is an unavailable witness.

Plaintiffs filed suit nearly one year after the fall on November 5, 2004.  They now move for sanctions because the Defendant failed to preserve the shower floor as evidence.

"The doctrine of spoliation of evidence permits a court to draw a negative inference against a party that has intentionally, and for an improper purpose, destroyed, mutilated, lost, altered, or concealed evidence."  Bronson v. Umphries, 138 S.W.3d 844, 854 (Tenn. Ct. App. 2003); Leatherwood v. Wadley, 121 S.W.3d 682, 703 (Tenn. Ct. App. 2003).  Trial courts have wide discretion to determine the appropriate sanction to be imposed.  Clark Constr. Group, Inc. v. City of Memphis, 229 F.R.D. 131, 139-140 (W.D. Tenn. 2005).

The Court finds that General Manager Luiz acted negligently when she directed the hotel maintenance man to tear out and dispose of the shower stall and did not preserve the shower floor. She testified Mr. Wert's conduct immediately after the incident "threw up red flags" and in a Guest Incident Report sent to her corporate office the day after the incident she characterized Mr. Wert as a person who "may be worth watching."  See Bronson, 138 S.W.3d at 854.  Ms. Luiz obviously realized the potential for litigation concerning Mr. Wert's fall.  Under circumstances where litigation was reasonably foreseeable, Ms. Luiz had an obligation to preserve relevant evidence.  See Blinzler v. Marriott Int'l, Inc., 81 F.3d 1148, 1159 (1st Cir. 1996).

Under Tennessee law, however, the spoliator must act intentionally and for an improper purpose before a sanction may be imposed.  Here, Ms. Luiz testified that she had the shower removed to promote guest safety and to prevent molding.  While the better practice would have been

7

for her to preserve the shower floor, there is no evidence from which the Court can find that Ms. Luiz acted intentionally and with an improper purpose to preclude the Werts from testing the evidence or using it in court.

Mrs. Wert took photographs of the shower floor. (Docket Entry No. 87, Ex. E.) Because the shower floor no longer exists, the photographs are the best evidence available and they likely will be admissible in evidence at trial. Plaintiffs are not entitled to a negative inference as a sanction, and thus, their Motion For Sanctions For Spoliation of Evidence will be denied.

### IV. MOTION FOR SUMMARY JUDGMENT

**A. Standard of Review**

A party may obtain summary judgment if the evidence establishes there are not any genuine issues of material fact for trial and the moving party is entitled to judgment as a matter of law. See Fed. R. Civ. P. 56(c); Covington v. Knox County School Sys., 205 F.3d 912, 914 (6th Cir. 2000). The moving party bears the initial burden of satisfying the court that the standards of Rule 56 have been met. See Martin v. Kelley, 803 F.2d 236, 239 n.4 (6th Cir. 1986). The ultimate question to be addressed is whether there exists any genuine issue of material fact that is disputed. See Anderson v. Liberty Lobby, 477 U.S. 242, 248 (1986); Covington, 205 F.3d at 914 (citing Celotex Corp. v. Catrett, 477 U.S. 317, 325 (1986)). If so, summary judgment is inappropriate.

To defeat a properly supported motion for summary judgment, the nonmoving party must set forth specific facts showing that there is a genuine issue of material fact for trial. If the party does not so respond, summary judgment will be entered if appropriate. Fed. R. Civ. P. 56(e). The nonmoving party's burden of providing specific facts demonstrating that there remains a genuine issue of material fact for trial is triggered once the moving party shows an absence of evidence to

8

Case 3:04-cv-01094    Document 97    Filed 08/15/07    Page 8 of 14 PageID #: 970

support the nonmoving party's case. Celotex, 477 U.S. at 325. A genuine issue exists "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Anderson, 477 U.S. at 248. In ruling on a motion for summary judgment, the Court must construe the evidence in the light most favorable to the nonmoving party, drawing all justifiable inferences in its favor. See Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

**B. Analysis**

To prevail on a negligence claim, a plaintiff must prove five elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation." Rice v. Sabir, 979 S.W.2d 305, 308 (Tenn. 1998). Defendant seeks summary judgment contending that Mr. Wert cannot prove causation in fact or proximate cause in that the testimony of his medical experts is inconsistent and it is unlikely Dr. Bisgard is qualified to testify regarding causation issues. Defendant also seeks summary judgment on the ground that Plaintiffs have not quantified their damages.

Taking the facts in the light most favorable to the Plaintiffs, there are genuine issues of material fact for trial concerning whether Plaintiffs can prove causation and proximate cause. Causation and proximate cause are distinct elements of a negligence claim and the Plaintiffs must prove both by a preponderance of the evidence. See Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendants' negligent conduct." Id. "Once it is established that the defendant's negligent conduct was, in point of fact, the actual cause of the plaintiff's injury or harm, the focus then becomes whether the policy of the law will extend responsibility for that negligent conduct to

9

the consequences that have occurred." Id. Proximate cause is that act or omission which immediately causes or fails to prevent an injury; an act or omission occurring or concurring with another which, if it had not happened, the injury would not have been inflicted. Tennessee Trailways, Inc. v. Ervin, 222 Tenn. 523, 528, 438 S.W.2d 733, 735 (Tenn. 1969). Under Tennessee law,

> [t]here is no requirement that a cause, to be regarded as the proximate cause of an injury, be the sole cause, the last act, or the one nearest to the injury, provided it is a substantial factor in producing the end result. . . . Proximate cause . . . [is a] jury question[] unless the uncontroverted facts and inferences to be drawn from the facts make it so clear that all reasonable persons must agree on the proper outcome.

McClung v. Delta Square Ltd. Partnership, 937 S.W.2d 891, 905 (Tenn. 1996). Causation of a medical condition must be established through testimony of a medical expert. Jackson v. Allen, No. M2000-01673-COA-R3-CV, 2002 Tenn. App. LEXIS 281 at *6 (Tenn. Ct. App. April 23, 2002); Miller v. Choo Choo Partners, No. E2001-00007-COA-R3-CV, 2001 Tenn. App. LEXIS 821 at *6 (Tenn. Ct. App. Nov. 5, 2001).

According to Plaintiffs, Mr. Wert's treating physicians, Dr. Bisgard and Dr. John Barker, who performed the 2004 and 2005 back surgeries, will present expert opinion testimony that Mr. Wert's fall in the shower at La Quinta Inns was the cause in fact, as well as the proximate cause, of the exacerbation or aggravation of Mr. Wert's previous degenerative back conditions, resulting in the need for the two additional back surgeries. Defendant's challenge to the admissibility of Dr. Bisgard's testimony was resolved above. Defendant highlights Dr. Barker's statements at deposition that he could not definitively say whether Mr. Wert's degenerative back conditions were caused by the fall in the shower or whether pre-existing degenerative back conditions were exacerbated or

10

aggravated by Mr. Wert's fall in the shower. (Docket Entry No. 55-2, Barker Depo. at 64, 68, 84-85, 90, 93.)

After the deposition, Dr. Barker supplied an affidavit in which he clearly stated his opinion that "while the fall did not cause [Mr. Wert's] degenerative disk disease, it made him more likely to be injured than a normal, healthy person[,]" and that "because of Mr. Wert's degenerative disk disease, the trauma to his spine from the fall was more likely to be greater than that of a normal healthy person." (Docket Entry No. 72-1, Barker Aff. ¶¶ 10-11.) Dr. Barker further attested that, "[a]t the time of the discovery deposition on December 4, 2006, I did not have the benefit of reviewing the 11/15/02 MRI. Since that time, I have seen that MRI and have compared it to the 12/8/03 (post-fall) MRI.[2] Based on the comparison of 2002 and the 2003 MRI, there is a definite change at L2-3, L4-5 and L5-S1." (Id. at ¶¶ 12-13.) He also attested that, "[i]n my opinion, while the fall was not the 'sole' cause of his spinal stenosis, it is more probable than not that it exacerbated [or aggravated] it[,]" and "[i]n my opinion, while the fall was not the 'sole' cause of his lumbar spondylosis, it is more probable than not that it exacerbated [or aggravated] it." (Id. at ¶¶ 14-15.) Dr. Barker further gives his opinions that "*based on a reasonable degree of medical certainty*, it is more probable than not that the trauma that Mr. Wert sustained in the fall of November 10, 2003 exacerbated [or aggravated] his pre-existing degenerative disk disease[,]" and "*based on a reasonable degree of medical certainty*, it is more probable than not that the trauma that Mr. Wert sustained in the fall of November 10, 2003 created the need for the medical treatment, diagnostic testing and surgery[.]" (Id. at ¶¶ 17, 19 (emphasis in original)).

---

[2]Defendant points out that Dr. Barker later revealed he did not actually look at the MRI scan, but reviewed an MRI report.

11

Faced with a post-deposition affidavit, the Court must determine whether the affidavit directly contradicts prior sworn testimony. See Aerel, S.R.L. v. PCC Airfoils, L.L.C., 448 F.3d 899, 908 (6th Cir. 2006). A directly contradictory affidavit must be stricken unless Plaintiffs provide a persuasive justification for the contradiction. Id. If there is no direct contradiction, the Court should not disregard the affidavit unless the Court determines that the affidavit constitutes an attempt to create a sham fact issue. Id. This inquiry turns on such factors as whether Dr. Barker was cross-examined during his earlier testimony, whether Dr. Barker had access to pertinent evidence at the time of his earlier testimony or whether the affidavit is based on newly discovered evidence, and whether the earlier testimony reflects confusion that the affidavit attempts to explain. Id. at 909.

The Court determines that it may consider Dr. Barker's affidavit. First, Dr. Barker testified during his deposition that his opinions were based on the information available to him at that time and "[w]hat might help me clarify it is if you have MRIs, which I'm sure you do from 2002, around the time that Dr. David Wong operated on him. And then we can compare those to 2003; that may help me. But with the knowledge I have right here today, I cannot state that." (Docket Entry No. 55-3, Barker Depo. at 90.) In the post-deposition affidavit, Dr. Barker attests that he compared the 2002 MRI to the 2003 MRI, which led to the 2004 and 2005 surgeries, and he could identify significant changes in Mr. Wert's lumbar spine linked to the trauma of the November 2003 fall. It appears that this new information led Dr. Barker to draw more conclusive opinions in his affidavit than he stated during his deposition. Moreover, due to time constraints at the time of the deposition, Plaintiffs did not have an opportunity to cross-examine Dr. Barker to bring out favorable opinion testimony. Dr. Barker's proof deposition was scheduled for a later date. The post-deposition

12

affidavit attempts to clarify points about which Dr. Barker believed he was lacking information at the time of the deposition.

For these reasons, the Court will consider Dr. Barker's affidavit in the context of the case as a whole. Taking all of the medical evidence in the light most favorable to Plaintiffs, there are genuine issues of material fact for trial on the negligence elements of causation and proximate cause. Summary judgment is not appropriate.

Finally, the Defendant contends that Plaintiffs failed to set forth a reasonable estimate of their damages sufficient to withstand summary judgment. Having carefully reviewed the record, the Court concludes that Plaintiffs provided the Defendant with sufficient evidence of their damages to withstand summary judgment. Both Plaintiffs testified at length about the impact of Mr. Wert's injury on his ability to work and enjoy activities of daily life, about activities in which he can no longer participate, about his pain and suffering, and about Mrs. Wert's loss of consortium. Plaintiffs also produced to Defendant statements of medical expenses and lost income payments as part of the workers' compensation carrier's subrogation claim. Plaintiffs also produced their federal income tax returns and other documents relating to damages. (Docket Entry Nos. 55-7 at 10; 55-9.) Because there is substantial evidence of damages in the record and reasonable inferences may be drawn from that evidence, mathematical precision is not required. ARC LifeMed, Inc. v. AMC-Tennessee, Inc., 183 S.W.3d 1, 28 (Tenn. Ct. App. 2005). The Plaintiffs' uncertainty at deposition as to the total amount of their damages will not prevent recovery of damages because there is sufficient evidence in the record to permit the Court, as trier of fact, to make a fair and reasonable assessment of damages, if any are to be awarded. See Pinson & Assoc. Ins. Agency, Inc. v. Kreal, 800 S.W.2d 486, 488 (Tenn. Ct. App. 1990).

13

## V. CONCLUSION

For all of the reasons explained above, Defendant's Motion In Limine to Exclude the Testimony of Elizabeth Bisgard, M.D. (Docket Entry No. 59), Plaintiffs' Motion for Sanctions for Spoliation of Evidence (Docket Entry No. 87), and Defendant's Motion for Summary Judgment (Docket Entry No. 55) will all be denied.

An appropriate Order shall be entered.

_____
ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE