**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | | |
|---|---|---|
| **HOWARD WERT and JOANN WERT,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | **No. 3:04-1094** |
| **v.** | ) | **Judge Echols** |
| | ) | |
| **LA QUINTA INNS, INC.,** | ) | |
| | ) | |
| **Defendant.** | ) | |

### MEMORANDUM

Plaintiffs Howard and JoAnn Wert bring negligence claims against Defendant La Quinta Inns, Inc., alleging that Howard Wert fell in the shower at a La Quinta Inn in Nashville, Tennessee, on November 10, 2003, causing permanent aggravation of his previous back conditions and necessitating two back surgeries. The Werts claim damages for medical expenses, pain and suffering, Howard Wert's lost wages, and JoAnn Wert's loss of consortium.

The Court presided at a bench trial held on October 16 and 17, 2007. At the conclusion of the trial, the Court asked counsel for the parties to submit proposed findings of fact and conclusions of law. Having carefully reviewed the post-trial submissions of the parties, the trial transcript, the trial exhibits, and deposition excerpts admitted into evidence by the parties, the Court now enters its Findings of Fact and Conclusions of Law. To the extent the parties' proposed findings of fact and conclusions of law have not been adopted or are different from those now entered by the Court, the parties' proposed findings and conclusions are hereby rejected.

### I. FINDINGS OF FACT

The Werts are residents of Littleton, Colorado. Howard Wert was employed by Xcel Energy in Colorado for more than thirty (30) years. At the time of the events at issue, Howard Wert was

about 58 years of age. He was 5'10" tall and weighed approximately 215 pounds. He held a salaried, plant supervisor position at his place of work, earning approximately $80,000 per year.

On October 31, 2003, the Werts left Colorado by car destined ultimately for Nashville, Tennessee, where Howard Wert planned to attend a work-related conference at the Embassy Suites Hotel from Tuesday, November 11 through Thursday, November 13, 2003. Along the way, the Werts stopped to visit friends in Missouri, took a side trip to Mississippi, and arrived in Nashville on Saturday evening, November 8, 2003. While staying with friends in Missouri for five to six days, Mr. Wert went pheasant hunting two days and drove heavy equipment to help his friend build a pond. The Werts had a reservation to stay at the Embassy Suites in Nashville beginning Tuesday, November 11. Because the Embassy Suites did not have a room available when the Werts arrived in Nashville on Saturday, the Werts checked into a LaQuinta Inn near Briley Parkway. They were assigned to Room 144 on the first floor, a handicapped room with a roll-in fiberglass shower. The Werts did not specifically request a handicapped room.

The Werts stayed in the room and used the shower without incident on Saturday night November 8 and Sunday, November 9. They went sightseeing in Nashville on Sunday and intended to continue sightseeing on Monday in advance of the conference.

On Monday morning, November 10, 2003, JoAnn Wert used the shower first without any problem. She was in the main room with the television on when Howard Wert went into the bathroom to take his shower. The bathroom door was partially closed. Howard Wert showered ten to fifteen minutes when he felt the shower floor give way under his right foot causing him to slip and fall. As he fell, his left arm swiped the mounted metal utility chair folded up at the back shower wall, and he landed on his right side with the lower part of his body in the shower and the upper part

of his body out of the shower. He called for his wife, who helped him get up and dry off. Mr. Wert felt pain in his lower back and hip as a result of the fall, but he was able to dress himself.

A bathmat was lying over the shower drain in the middle of the shower floor. The hotel's General Manager, Catherine Luiz, purchased the bathmat for the room at some earlier time at the request of a former hotel guest. Upon moving the bathmat to one side, the Werts realized that the shower floor had cracked near the drain, and it appeared as though the floor had cracked in more than one direction. There also appeared to be a patch of bluish caulking material that had been spread over a crack, indicating a previous attempt to repair the shower floor. The shower floor sat approximately one to one-and-one-half inches above the concrete pad foundation.

Mrs. Wert took two photographs of the shower floor as it appeared that day. (Pl. Exs. 1A & 1B.) These photographs do not depict the shower grab bar. The lighting in the two photographs is different, and the cracks in the shower floor seem to present different characteristics in the two photos. The Court finds, however, that the shower floor was cracked at some earlier time before the Werts were hotel guests, and that some person employed by the hotel attempted to repair the shower floor by spreading a layer of caulking or patch material across the crack. The Court further finds that the bathmat was placed over the repaired crack and that the bathmat as placed concealed the existence of the crack from hotel guests who did not lift the bathmat to look under it.

La Quinta Inn policies required the head housekeeper and room attendants to inspect the guest rooms on a daily basis before the rooms were rented to guests to ensure that no safety hazards were present and that no repairs were needed. Hotel supervisors and employees were required to report to the hotel's General Manager any unsafe conditions or repair needs identified in any part of the hotel, whether in the guest rooms, the hotel interior or the hotel exterior. (Pl. Exs. 11-15.) The Court finds that General Manager Luiz was not informed by one or more members of her staff

Case 3:04-cv-01094   Document 167   Filed 02/13/08   Page 3 of 46 PageID #: 2090

that the shower floor in Room 144 had cracked previously, nor was she informed that an attempted repair of the crack had been made. The employees' failure to report the condition of the shower floor to Ms. Luiz constituted a violation of hotel policies which required employees to take all reasonable precautions to provide guests with safe conditions to avoid personal injury to them. Although the Werts did not present any evidence that the attempted patch repair of the shower floor was negligently done, General Manager Luiz admitted at trial that a cracked shower floor should have been brought to her attention by the head housekeeper or the head of the maintenance department and, had she known of the cracked shower floor, she would have directed that the shower be replaced, not repaired.

Howard Wert approached Ms. Luiz about his fall in the shower as he was checking out of the hotel on the morning of November 10, 2003. He complained of back and hip pain as a result of his fall, and Ms. Luiz offered to send Mr. Wert to a hospital or clinic for medical care, but he refused medical care. Mr. Wert asked Ms. Luiz to make a written statement about his fall, but Ms. Luiz refused to do so on the ground that she did not witness his fall and she had no first-hand information about it. Ms. Luiz took Mr. Wert at his word that he had, in fact, fallen in the shower. However, Ms. Luiz felt that Mr. Wert was intimidating and demanding. Ms. Luiz provided a form to Mr. Wert so that he could write his own statement about the fall. Mr. Wert completed in his own handwriting a La Quinta Accident Report stating: "When taking shower, shower base floor broke through fell in shower and hit shower stool – Having a lot of pain in back and hip." (Pl. Ex. 17.) In her handwriting, Ms. Luiz wrote on the report: "Rec'd complaint gave business card and asked guest to call if he needs care. Room taken out of order." (Id.) Ms. Luiz did not charge the Werts for one night. The Court finds that Ms. Luiz did not accompany Mr. Wert to the room to view the

4

shower floor in his presence at any time, nor did Ms. Luiz make any statement to Mr. Wert such as "we should have replaced the shower, not repaired it."

After the Werts checked out of the hotel, Ms. Luiz went to Room 144 with Samuel Mendez, the maintenance department head, and inspected the shower stall. Ms. Luiz observed a crack in the shower floor. Although she denied that the shower floor had been repaired previously and she did not recall seeing the attempted patch repair across a previous crack, the Court finds that such a crack and patch material existed as shown in the photographs taken by JoAnn Wert. Ms. Luiz did not take any photographs of the shower floor because hotel policy did not require her to do so and she did not have a camera available. She also did not take any measurements. At Ms. Luiz's direction, Mr. Mendez removed the shower stall and put it in the hotel dumpster within twenty-four hours; thus, the shower floor was not available during discovery in this case. Ms. Luiz sent Mr. Mendez to Home Depot for a new shower stall, but he was unable to locate one that fit. Ms. Luiz then contacted her corporate office for assistance. She was advised that a replacement shower stall would be sent to her and that she should leave the room out of service until the repair was completed.

On November 11, 2003, Ms. Luiz completed a "Guest Incident Report" and submitted it to the corporate office. In describing the incident, Ms. Luiz wrote: "Guest stepped through the bottom of the shower [causing] him to slip and fall[.]" (Pl. Ex. 18.) On a separate attached page, Ms. Luiz stated:

> . . . Guest attempted to force manager to write a statement about what had happened and sign it. I of course refused as I did not witness anything. Attempted to get guest to see a doctor, he refused medical care. Is in town a few more days at the Embassy Suites for a seminar. He took my business card and I told him to call me if the pain worsened.

He made me very cautious when he started demanding I write something down. this
one may be worth watching.
Room is out of order pending repairs.

(Pl. Ex. 18 at 2.)

After the Werts left the La Quinta Inn on Monday, November 10, they checked in at the

Embassy Suites where the conference was to start on Tuesday.  On Monday they stayed in their

room much of the day due to Mr. Wert's back pain.  Mr. Wert rated his pain after the fall as "not

very much" (at a 2 or 3 out of 10), and he just felt like he "bruised something."  (Trial Tr. at 133.)

 They went out to eat twice at the Plantation House.  (Def. Exs. 14-15.)  The Court accepts the

Werts' testimony that they visited the Hermitage on Sunday and not on Monday.

Mr. Wert was able to attend the conference all day Tuesday and Wednesday, although he

alternated taking Tylenol and Excedrin for back pain.  Margaret McParland, another program

attendee from Xcel Energy, noticed that Mr. Wert looked uncomfortable and she could tell he was

hurting.  Mr. Wert rated his pain at 4 out of 10 during the remainder of his stay in Nashville.  On

Tuesday and Wednesday evenings, the Werts joined other Xcel Energy supervisors attending the

conference for dinners at restaurants and a trip to Opry Mills mall. Although Mr. Wert testified that

he did not walk at all in the mall, the Court finds that Mr. Wert did join his wife and the other

supervisors in walking to the stores in the mall.  On Thursday, the conference ended by late

morning, and the Werts decided to drive non-stop the 1160 miles (approximately twenty (20) hours)

to their home in Colorado.  Mr. Wert drove for the first hour, but because of his back discomfort,

Mrs. Wert drove the remaining hours.  They stopped only for bathroom breaks and take-out food.

They arrived at their home at approximately 8 a.m. on Friday, November 14, 2003.  Mr. Wert made

an appointment to see his primary care  physician, Dr. Jacque Saari, on Monday, November 17,

2003.  Mr. Wert testified that he tried to work a 12-hour shift on Sunday, November 16, 2003, but

6

he felt so bad that he called in another supervisor to complete his shift and he went home. The Court finds that Mr. Wert's testimony that he was debilitated by back pain on Sunday, November 16 and unable to complete his work shift is not credible in light of a charge on his credit card statement on November 16, 2003 showing a purchase of $708.08 at the Sportsman's Warehouse in Aurora, Colorado. (Def. Ex. 14.)

Mr. Wert saw Dr. Saari on Monday, November 17. Dr. Saari ordered an x-ray and prescribed a muscle relaxant. Mr. Wert reported his fall to his employer as a work-related accident and thereafter began medical treatment with his employer's worker's compensation physician, Dr. Elizabeth Bisgard.

In his initial written report about his injury, Mr. Wert stated that his job required him to bend or twist at the waist, kneel, reach above his chest, over his head and away from his body, squat, sit four hours a day, and keystroke three hours a day. (Def. Ex. 5.) Mr. Wert did not check the boxes for carrying, climbing, crawling, driving, lifting, operating machines, pushing or pulling, repetitive lifting, standing, or walking. (Id.)

Because Mr. Wert previously had undergone two back surgeries in 2002 performed by Dr. David Wong, Dr. Bisgard referred Mr. Wert to Dr. Wong for his opinion about Mr. Wert's November 10 fall and his reported back pain. Dr. Wong examined Mr. Wert on December 9, 2003. (Def. Ex. 16.) Dr. Wong stated in his progress notes that Mr. Wert reported his overall symptom level was about the same as it had been for weeks and that he continued to have problems on a daily basis. Mr. Wert rated his day-to-day pain as between 7 and 10 out of 10, with 10 being the worst. Mr. Wert reported his pain was 7 on the day of examination, and he stated that his symptoms increased with mechanical activities and that he could get partial relief with rest. Dr. Wong stated in his progress notes:

The physical exam reveals an overweight but otherwise generally healthy-appearing white male in no acute distress. He is oriented x3. The patient stands with a slightly stooped-over posture but otherwise normal spinal contours in the head, neck, thoracic and lumbar areas. He has a slightly hesitant gait. He has well-healed posterior lumbar surgical incision. He has mild paraspinal and buttock tenderness in the lumbosacral region. Minor spasms. No gaps, steps or masses.

Lumbar range of motion is 60 degrees forward flexion, 10 degrees extension with mild discomfort at both extremes. Straight leg raising to 80 degrees bilaterally with no root tension.

(Id. at 2.) An x-ray revealed Mr. Wert had mild left degenerative scoliosis in the midlumbar spine, significant loss of disk height at L2-3, which was at the level of his previous surgery, and minor narrowing of other lumbar levels with anterior osteophytes, more at L2-3 but to a minor degree at other levels. Dr. Wong stated:

1. I think the patient likely suffered a lumbar sprain/strain in the fall of [11/10]. No evidence of fracture, dislocation, or other major traumatic abnormality.
2. I think his pain to the buttock area is likely referred from the back.
3. May have an element of chronic sprain/strain with his paraspinal soft tissue tenderness and spasms.
4. No significant radicular radiation or neurologic findings on exam to suggest that further investigation of the spinal cord is required at present.

(Id.) Dr. Wong suggested physical therapy and a possible switch in his anti-inflammatory medication. He noted that Mr. Wert "may be a candidate for facet blocks at L2-3 and L3-4." (Id.) Dr. Wong further stated that Mr. Wert "was concerned that he was going to need additional surgery, but I doubt he would be a candidate for a microdecompression as he does not have significant radicular symptoms and with his multilevel degenerative changes, he is not a good candidate for fusion." (Id.) Dr. Wong returned Mr. Wert to Dr. Bisgard's care and did not set regular appointments for Mr. Wert to see him. (Id.)

Before proceeding to detail further the medical treatment Mr. Wert received following his November 10, 2003 fall, it is instructive to the Court's ultimate analysis to review Mr. Wert's

8

medical history of back pain, which began as early as November 2000 when lumbosacral spine x-rays were obtained by Dr. Saari. Those studies showed degenerative changes in Mr. Wert's spine, and while disk spaces were maintained, there were apparent "defects in both par interarticularis of L5, but there [was] no evidence of spondylolisthesis."[1] (Def. Ex. 40.)

Mr. Wert first saw Dr. Wong on April 6, 2001, for an orthopaedic consultation on referral from Dr. Saari. Mr. Wert complained of low back and left leg pain, and he told Dr. Wong that he first noticed symptoms nine months earlier without any definite precipitating event. (Def. Ex. 18.) Mr. Wert wondered "if onset is related to lifting and carrying heavy furnaces and air conditioning units." (Id.) Mr. Wert rated his daily pain as an 8 out of 10, with 10 being the worst. He reported that his symptoms were increased with walking, lateral bending, and coughing. Symptoms were relieved to some degree through stretching and changing body position. Mr. Wert was taking aspirin and Tylenol for pain and he modified his activities, but he had not lost any time from work. At trial Mr. Wert denied that he injured his back lifting heavy furnaces and air conditioning equipment.

Magnetic resonance imaging (an "MRI")[2] performed on March 16, 2001, showed desiccated[3] discs in Mr. Wert's lumbar spine, particularly at the upper three levels. He had mild stenosis[4] at L3-

---

[1]"Spondylolisthesis" is forward movement of the body of one of the lower lumbar vertebra on the vertebra below it or upon the sacrum. Stedman's Medical Dictionary, 27th ed. Hereinafter, unless stated otherwise, all medical definitions are taken from Stedman's or Merriam Webster Medline Plus®.

[2]Magnetic resonance imaging is "a diagnostic radiologic modality, using nuclear magnetic resonance technology, in which the magnetic nuclei (especially protons) of a patient are aligned in a strong, uniform magnetic field, absorb energy from tuned radiofrequency pulses, and emit radiofrequency signals as their excitation decays. These signals, which vary in intensity according to nuclear abundance and molecular chemical environment, are converted into sets of tomographic images by using field gradients in the magnetic field, which permits 3-dimensional localization of the point sources of the signals." Stedman's Medical Dictionary, 27th ed.

[3]"Desiccate" means to dry thoroughly; to render free from moisture.

[4]"Stenosis" is a stricture of any canal or orifice.

9

4 and to a lesser degree at L2-3. (Id.) Dr. Wong's impression was that Mr. Wert had mechanical back pain secondary to multilevel degenerative changes. While he may have had some radicular[5] irritation from the stenosis, he did not have any major radiculopathy[6] on clinical examination. Dr. Wong prescribed a sustained course of anti-inflammatory medication and physical therapy. (Id.)

On November 15, 2001, Mr. Wert was seen by Dr. Ronald Hattin for a trial of lumbar epidural steroid injections. (Pl. Ex. 8.) Mr. Wert reported that medication and physical therapy ordered by Dr. Wong had provided no specific symptomatic improvement and in the previous six months he had begun to have similar symptoms involving his right leg. Dr. Hattin's final impression was "Multi-factoral, multi-level spinal stenosis centered predominantly L2-L3, L3-L4, and L4-L5 with symptoms of neurogenic claudication."[7] (Id.)

By January 2002, Mr. Wert returned to Dr. Wong reporting some back pain and "difficulties with bilateral leg pain, numbness, intermittent weakness, giving way and burning." (Def. Ex. 29.) Mr. Wert reported he had reached the point that he could no longer work without significant difficulty in standing and walking. He had received three epidural steroid injections from Dr. Hattin with only partial temporary relief of symptoms. (Id.) Having discussed the situation with Mr. Wert, Dr. Wong wrote: "He is anxious to proceed with surgical intervention. I think he is a candidate for a decompression . . . With his multilevel degenerative changes he is not an ideal fusion candidate. Overall I think he could expect a 50-75% reduction in symptoms." (Id.) On January 16, 2002, Dr. Saari excused Mr. Wert from work until further notice due to "severe spinal stenosis that requires

---

[5]"Radicular" means relating to a radicle–a rootlet or structure resembling one, as in the radicle of a nerve, a nerve fiber that joins others to form a nerve.

[6]"Radiculopathy" is a disorder of the spinal nerve roots.

[7]"Neurogenic" means originating in, starting from, or caused by, the nervous system or nerve impulses; "claudication" means the quality or state of being lame.

10

corrective surgery[.]"   (Def. Ex. 21.)   Mr. Wert took five days of paid time off and then was on short-term disability between January 17, 2002 and May 31, 2002.  (Pl. Ex. 6.)

On January 28, 2002, Dr. Wong performed bilateral L2-3 and L3-L4 laminectomies[8] with partial facetectomy[9] for laminotomy[10] and nerve root decompression.  (Def. Ex. 39.)  Dr. Wong did not perform a diskectomy[11] because disk herniations at these levels were small.  Mr. Wert initially did well with some mild residual numbness in the legs which Dr. Wong felt might be due to neuropathy.[12]  (Def. Ex. 38.)   Mr. Wert recovered well from this surgery and returned to work in late May 2002.

On September 10, 2002, Mr. Wert returned to Dr. Wong nine months following his L2-3 and L3-4 decompressions.  According to Dr. Wong's progress notes, Mr. Wert was doing "fairly well with some mild residual foot numbness and intermittent giving way until a week or so ago when he was in Branson climbing over some properties and fell on a slope."  (Def. Ex. 17.)  Dr. Wong further stated in his progress notes that the day after Mr. Wert fell in Branson, he "had more discomfort in the right low back and radiation into the leg."  (Id.)  Mr. Wert was taking prescription Vicodin for pain with some partial improvement, and he told Dr. Wong he worked 12-hour shifts the prior three days, but found that walking on the concrete floors aggravated his condition.  (Id.)  Dr. Wong noted

---

[8]Excision of a vertebral lamina (a thin plate or layer, as the part of the neural arch of a vertebra extending from the pedicle to the median line); commonly used to denote the removal of the posterior arch.

[9]Excision of a facet (a smooth, flat or nearly flat circumscribed anatomical surface) especially of a vertebra.

[10]Surgical division of a vertebral lamina.

[11]Surgical removal of an intervertebral disk.

[12]An abnormal and usually degenerative state of the nervous system or nerves.

11

that Mr. Wert had mild paraspinal tenderness and minimal spasms. He was able to flex forward sixty degrees and extend five degrees. "Motor [was] intact in the lower extremities" and he had "some patchy, nonradicular sensory loss in both feet." (Id.) Dr. Wong diagnosed "Lumbar sprain/strain superimposed on chronic post-op changes." (Id.) He renewed Mr. Wert's Vicodin prescription and also prescribed Relafen as an anti-inflammatory. Dr. Wong suggested a course of physical therapy and directed Mr. Wert to return in a month if he was still symptomatic. (Id.)

In October 2002, a new MRI scan was obtained, and Dr. Wong reported in progress notes in November 2002 that this MRI study revealed "a new large disc herniation at L2-3 on the right with an inferior migrating free fragment causing significant neural impingement. He had a good decompression of the canal from his previous laminectomy." (Def. Ex. 30.) Dr. Wong did not comment again in his progress notes about the existence of the pars defect at L-5, of which Dr. Wong had been aware since his first visit with Mr. Wert in 2000. Rather, Dr. Wong focused on the new large disc herniation at L2-3. Dr. Wong stated that Mr. Wert indicated his thigh pain was no better and if anything slightly worse, he reported some numbness in the distal thigh down to the knee cap, and he felt his leg was slightly weaker and might give way. (Id.). Dr. Wong stated:

> In these circumstances, I think he would be a candidate for a revision decompression and discectomy at L2-3. The patient feels he would like to proceed. I have discussed limited expectation for symptom improvement and risks with him. He would like to take longer off work before getting back as he is concerned that walking on the hard surfaces as well as his fall in Branson may have contributed to the problem. I have also pointed out that some of his persistent numbness distally may still continue even after this surgery.

(Id.)

At trial, Mr. Wert's counsel asked him how many times he had fallen in the past ten years. Mr. Wert replied:

12

The only real thing that might have concerned me about falling is that between by surgery with Dr. Wong – between the first and second surgery, I spent some time in Branson, Missouri with my buddy Bill. We were looking at some property. And, you know, we were walking around a side hill. It was gravelly and grassy. We were walking sideways and started sliding down a little bit. I sat down on my behind and bounced down the hill a little bit.

That's the only real fall I can contribute to actually falling. But that didn't seem to bother me too much, because I think a day or two later I was water skiing behind his boat.

(Trial Tr. at 81.) The Court asked if Mr. Wert had ever fallen while water skiing, and Mr. Wert replied that he had. In fact, he stated, "I don't know whether I consider that a fall because you do it so often." (Id. at 82.)

On cross-examination, Mr. Wert testified:

As far as falling, the only other fall that I recall was when I was in Branson, looking at some property, and I slid down the hill. But that didn't seem to be a problem for me. And I did tell Dr. – I think I told Dr. Wong about it, or one of the doctors about it. And I said it didn't seem to cause me a problem, because I was water skiing a day or two later with my friend. But I did slide down the hill and maybe that caused me a problem. I don't know.

(Id. at 150-151.) Again, defense counsel asked Mr. Wert: "You and Bill Bear were walking around in Branson, Missouri in 2002, and you slid down a hill, sitting on your butt, but it didn't hurt you at all. Is that correct?" (Id. at 152.) Mr. Wert responded: "I'm not saying it didn't hurt me at all. You know, I skinned my butt a little bit, I think. But, you know, I didn't hurt. You know, it wasn't something that slowed me up any. I just went on about my vacation." (Id.) Bill Bear also testified at trial that Mr. Wert water skiied the day after he fell down the slope in Branson. (Id. at 200.) Mr. Wert's trial testimony reveals that he previously hurt his leg in a parachute accident years ago. (Id. at 151.) Yet, at his discovery deposition, Mr. Wert testified that the only time he had ever fallen was November 10, 2003. (Id.)

13

The Court finds that Mr. Wert reported to Dr. Wong that his pain increased the day after his fall in Branson and Mr. Wert apparently did not tell Dr. Wong he had been water skiing after the fall. Further, the Court finds that, although further investigation of Mr. Wert's back condition in the fall of 2002 resulted in a second back surgery by Dr. Wong, Mr. Wert denied at trial that he was injured by a fall in Branson. The Court further finds that Mr. Wert's trial testimony that he did not injure his back while visiting Branson is inconsistent with what he told Dr. Wong when seeking treatment for his back condition in 2002, and this discrepancy reflects poorly on Mr. Wert's credibility. The Court finds that Mr. Wert did take previous falls, despite his attempt at trial to minimize any previous falls that might have contributed to his back problems.

On November 27, 2002, Dr. Wong performed a second surgery on Mr. Wert which he characterized as: "Revision right L2-3 microlaminectomy with partial facetectomy, foraminotomy,[13] nerve root decompression, and diskectomy." (Def. Ex. 38.) Mr. Wert was off work on paid time off and short term disability starting the day before the second surgery, November 26, 2002. (Pl. Ex. 6.)

On February 14, 2003, three months after the second surgery, Dr. Wong saw Mr. Wert again. Mr. Wert reported that he had been in rehabilitation with physiotherapy traction and taking anti-inflammatory medication, but he felt his symptoms were slightly worse than they were the previous visit. (Def. Ex. 1.) He continued to have numbness in both feet and some back pain shooting into the thighs, greater on the right than left. He rated his back pain 8 or 9 out of 10 with 10 being the worst. Dr. Wong decided to obtain EMG and nerve conduction studies to determine if Mr. Wert's

---

[13]An operation upon an aperture, usually to open it, e.g., surgical enlargement of the intervertebral foramen (an aperture or perforation through a bone or a membranous structure).

14

difficulties were due to residual acute radicular problems or neuropathy with numbness in both feet. (Id.)

Dr. John Myers conducted the EMG study. In his February 26, 2003 report, he observed that Mr. Wert told him he had experienced a burning sensation in his feet since his November 2002 back operation performed by Dr. Wong. Prior to that surgery, he had experienced five to six months of discomfort in his back with extension of pain into his legs. Mr. Wert reported "dramatic improvement with the decompressive surgery. . . . He does report a tendency to wobble or fall easily." (Def. Ex. 26.) Dr. Myers stated the EMG was "an abnormal study most consistent with a peripheral demyelinating[14] and axonal[15] neuropathy. The loss of amplitude as well as the dramatic slowing of his motor velocities" made Dr. Myers "most concerned about an inherited form of neuropathy such as Charcot-Marie-Tooth disease." (Id.)

Mr. Wert visited Dr. Saari the next day, on February 27, 2003, to discuss his new diagnosis of probable Charcot-Marie-Tooth disease. (Def. Ex. 27.) Mr. Wert apparently was due to return to work shortly. (Pl. Ex. 6.) Dr. Saari stated in his progress notes that Mr. Wert was "not really able to walk or stand for more than 15 minutes" and was limited by numbness and pain in his legs at work "and requires a note for this. He can't lift more than 20 pounds, can't climb stairs or ladders related to weakness, nerve discomfort, instability." (Id.) Mr. Wert then telephoned Dr. Myers on March 3, 2003 "wondering how abnormal the nerve conduction studies were[.]" Dr. Myers "pointed out they were quite abnormal and reflect[ed] a significant dysfunction involving the nerves." Dr. Myers encouraged Mr. Wert to pursue the matter further with his primary care physician. (Def. Ex.

[14]Causing or characterized by the loss or destruction of myelin (a soft white somewhat fatty material that forms a thick sheath about the protoplasmic core of a myelinated nerve fiber).

[15]A usually long and single nerve-cell process that usually conducts impulses away from the cell body.

15

28.)    On May 6, 2003, Mr. Wert was seen by a cardiologist to evaluate his condition of atrial fibrillation.  (Def. Ex. 23.)  The physician noted Mr. Wert's Charcot-Marie-Tooth syndrome and stated: "He gets pain in his leg that is attributed to his Charcot-Marie-Tooth syndrome."  (Id.)

Thus, the Court finds that in early 2003, several months before Mr. Wert fell at the La Quinta Inn in Nashville in November 2003, Mr. Wert had been diagnosed with an inherited form of Charcot-Marie-Tooth disease, and this disease caused him to have weakness and instability in his legs and feet, resulting in an inability to stand for more than 15 minutes.   The Court finds that this disease contributed to Mr. Wert's fall in the shower at the La Quinta Inn, as Mr. Wert testified he had been showering at least 10 minutes when his right foot gave way and he fell.

At trial defense counsel confronted Mr. Wert about giving, during his discovery deposition, a list of physicians who treated him for back pain, but failing to include Dr. Wong on the list. Mr. Wert tried to explain his failure to list Dr. Wong as just having "spaced it off."  This testimony is not believable and reflects negatively on Mr. Wert's overall credibility.  Dr. Wong operated on Mr. Wert twice for back problems.  It is simply not credible that Mr. Wert would "space off" the name of his orthopedic surgeon at the deposition.  Even if he could not remember the doctor's name, he certainly could have revealed details about his visits and surgeries with Dr. Wong.

After the two surgeries with Dr. Wong, Mr. Wert returned to work at Xcel Energy on March 10, 2003, (Pl. Ex. 6),  putting in regular eight- and twelve-hour shifts each month until October 31, 2003, when he and his wife left Colorado on their trip to Nashville.  Mr. Wert was able to handle all of the functions of his job when he returned to work.  He was a good employee and was not disciplined for any reason.  Mr. Wert testified that, after his second surgery with Dr. Wong in 2002, he did very well and returned to many of his normal activities in 2003, such as water skiing, driving all-terrain vehicles ("ATVs") with his sons, playing with his grandchildren, and hunting and

16

fishing. Although he still felt numbness in the lower part of his legs and feet, he led an active lifestyle and participated in rigorous physical activities. His participation in rigorous physical activities persisted until days before he arrived in Nashville, when he carried a gun and walked more than five miles in a day pheasant hunting and drove heavy equipment over rough terrain helping his friend build a pond in Missouri.

The Court finds that Plaintiffs' Exhibit 7, which purportedly documents Mr. Wert's work hours between March and November 2003, is not an accurate and reliable exhibit. The Court disregards the exhibit, as well as Mr. Wert's testimony based on Exhibit 7 about the number and length of shifts he worked. Mr. Wert testified that, as a salaried supervisor, he entered his own work hours into the company's computerized payroll system. At trial he utilized Plaintiffs' Exhibit 7 to corroborate his testimony that he was able to work regular, 12-hour shifts between the time Dr. Wong and Dr. Saari released him to return to work on March 10, 2003 and his fall in Nashville on November 10, 2003. Yet, Plaintiffs' Exhibit 7 also shows that, on June 13, 2003, Mr. Wert lost work time to a paid worker's compensation accident or injury, and Mr. Wert denied at trial that any such accident or injury occurred on that date. Plaintiff's Exhibit 7 shows that Mr. Wert was working 12-hour shifts on November 7 and 8, 2003, despite trial testimony that the Werts were visiting in Missouri and Mississippi enroute to Nashville on those dates. Exhibit 7 further shows that Mr. Wert was working on November 9 when there is no dispute that the Werts were actually sightseeing in Nashville on that day. In addition, Exhibit 7 shows that Mr. Wert worked a 12-hour shift on November 10, 2003, the day he fell at the La Quinta Inn in Nashville. Plaintiff's Exhibit 7 does not account for Tuesday through Thursday, November 11 through 13, 2003, when Mr. Wert was attending a work-related conference in Nashville. The exhibit then shows that Mr. Wert took paid time off on Friday and Saturday, November 14 and 15, which likely is accurate, as that is when the

Werts returned home after the conference. But Exhibit 7 then reflects that Mr. Wert worked a full 12-hour shift on Sunday, November 16, 2003. As previously stated, however, Mr. Wert testified he did not work a full shift on Sunday due to back pain, even though Mr. Wert's credit card statement indicates he may have been shopping at a sporting goods store that day. Mr. Wert could not explain these discrepancies in answer to questions posed to him by the Court and defense counsel, and he admitted that these work records "can't be right."

If the Court accepts as true Mr. Wert's testimony that he entered his own work hours into the company's payroll system, the Court can only draw the reasonable inference that Mr. Wert either negligently or intentionally misstated his work hours to his employer. Either way, such a reasonable inference reflects negatively on Mr. Wert's credibility. Because these unexplained discrepancies relate to times and issues critical to this lawsuit, the Court finds that Plaintiffs' Exhibit 7, as well as Mr. Wert's testimony based upon the exhibit, must be rejected as an inaccurate and unreliable account of Mr. Wert's work history in 2003.

After the November 10, 2003 fall in Nashville and after Dr. Wong opined that Mr. Wert suffered only a lumbar sprain or strain from the incident, Mr. Wert returned to see Dr. Bisgard on December 17, 2003, for a "recheck visit." (Def. Ex. 31.) Dr. Bisgard's notes reflected lumbar spine x-rays were "positive for significant degenerative changes and scoliosis," and an MRI scan was "positive for degenerative changes with central canal and foraminal stenosis[.]" (Id.)

The MRI report stated there was evidence of the prior surgeries completed by Dr. Wong and "[d]isk protrusions at multiple levels" of L2-3, L3-4, L4-5, and L5-S1 that did "not produce significant central spinal stenosis at any lumbar level." (Def. Ex. 37.) The report also stated "[f]oraminal stenosis is moderate at bilateral L2-3, mild-to-moderate at left L3-4, and mild at right

L3-4 and bilateral L5-S1." (Id.) The MRI also showed "[b]ilateral L5 pars defects without associated anterolisthesis. There may be fibrous union at this level." (Id.)

The Court finds that this MRI report was consistent with the November 2000 report of Mr. Wert's lumbosacral spine x-rays obtained by Dr. Saari, which at that time showed degenerative changes in Mr. Wert's spine and apparent "defects in both par interarticularis of L5" with no evidence of spondylolisthesis. (Def. Ex. 40.) The Court further finds that, although this report described the results of an MRI scan taken on December 8, 2003, Dr. Wong did not mention in his progress notes of December 9, 2003, that he had reviewed the results of this MRI scan. (Def. Ex. 16.) Dr. Wong's progress notes stated that he viewed "AP and lateral lumbar plain films" and he suggested that if Mr. Wert remained symptomatic, "ultimately he may be a candidate for a gadolinium-enhanced MR scan of the lumbar spine to further define any spine pathology[.]" (Id.)

Dr. Bisgard wrote in her December 17, 2003 progress notes that Mr. Wert's chief complaint was back pain and he was there for reevaluation. (Def. Ex. 31.) Mr. Wert had seen Dr. Wong the previous week and was "quite discouraged because Dr. Wong does not feel that he is a good surgical candidate." (Id.) Mr. Wert told her that he was feeling worse, he was very limited in his activities, and he was having difficulty sleeping, having to alternate between his bed, a couch, the floor and a chair. He reported pain with any periods of prolonged standing. He described a knot sensation in his right back and hip area and stated that he was "'essentially miserable.'" (Id.) He complained of numbness and tingling down his right leg to his right foot and stated that his right leg felt weak, although he had not lost control of his right leg. (Id.)

Dr. Bisgard observed that Mr. Wert did appear to be quite uncomfortable and had difficulty going from the sitting to standing position and getting up on the examination table. He could not toe and heel walk due to his Charcot-Marie-Tooth disease. His forward flexion was limited to forty

19

degrees with onset of pain. (Id.) The Court notes that about one week earlier, Dr. Wong had noted Mr. Wert's forward flexion at sixty degrees, which indicates to the Court that Mr. Wert may have been exaggerating his physical difficulties to Dr. Bisgard. (Def. Ex. 16.) Mr. Wert's reflexes were absent for his bilateral lower extremities and sensory examination was altered in his bilateral lower extremities. (Def. Ex. 31.) Dr. Bisgard felt it was "difficult to assess whether this is due to a true radiculopathy versus his Charcot-Marie-Tooth." (Id.) Like Dr. Wong, Dr. Bisgard diagnosed lumbar strain/pain, and also noted Mr. Wert's degenerative disk disease. She directed that he should remain off work, start physical therapy, and alternate Percocet and Vicodin for pain. (Id.)

Dr. Bisgard referred Mr. Wert to Dr. L. Barton Goldman, a physiatrist, for outpatient consultation. (Def. Ex. 42.) Mr. Wert saw Dr. Goldman for the first time on January 7, 2004, and complained of "[l]ow back pain and right leg (proximal-hip) pain" continuing for two months. (Id.) Mr. Wert told Dr. Goldman of his history of two back surgeries with Dr. Wong and stated that he was released to return to work "full time, full duty around 3-4 months after the November 2002 back surgery." (Id.) Mr. Wert further stated that "he had no restrictions with respect to his back condition and that his symptoms had completely resolved with respect to back and leg pain just prior to the November 2003 work related injury." (Id.) He did report, however, that "he did have restrictions with respect to lifting due to a non-work related Charcot-Marie-Tooth Syndrome resulting in substantial numbness and some weakness in bilateral legs below the knees." (Id.)

In stating the history of Mr. Wert's "present illness," Dr. Goldman commented that, "[u]pon seeing Dr. Bisgard it was well documented that the patient had increased pain and numbness in his right leg primarily above the knee, which distinguished the symptoms from his non-work related Charcot-Marie Tooth Syndrome." (Id.) The Court finds that Dr. Goldman's remark is inconsistent with Dr. Bisgard's progress notes of December 17, 2003, because it does not appear to the Court that

20

Dr. Bisgard made any such finding. (Def. Ex. 31.) Dr. Goldman also stated that Dr. Bisgard kept

Mr. Wert off work and had him evaluated by Dr. Wong, "who opined after reviewing an MRI scan

that the patient was not an ideal candidate for further surgery. Such surgery presumably would

involve multiple level fusions since the MRI scan showed multiple level degenerative changes[.]"

(Def. Ex. 42.) As stated, Dr. Wong did not indicate in his notes that he had reviewed the

December 8, 2003 MRI scan, but Dr. Goldman's interpretation of Dr. Wong's impression appears

to be correct. Dr. Wong opined that, "with his multilevel degenerative changes, [Mr. Wert] is not

a good candidate for fusion." (Def. Ex. 16.) Dr. Goldman also stated in his notes that Mr. Wert

had four physical therapy sessions sporadically over the last two to three weeks due to the holidays

and weather issues, and he was not responding to the therapies as of yet. (Def. Ex. 42.)

Dr. Goldman wrote that "[p]ain varies from 100% in the back to 50/50 between back and right upper

thigh and varies from an 8-10/10, although the patient denies suicidal ideation." He also wrote:

"Reclining is the main way to control his pain and flexion seems to be worse with extension by

history, but on examination the opposite appears to be true. All other activities seem to increase the

patient's pain." (Id.)

Mr. Wert reported that he enjoyed hunting, fishing, boating and hiking, but that he could not

"do any of these activities to his satisfaction since he re-injured himself in November as described."

(Id.) Mr. Wert stated he had difficulty tying his shoes and any activities that involved a lot of

bending, as well as heavy house and yard work and prolonged standing to prepare meals. He stated

he could sit for one hour, stand for 15 to 20 minutes, drive continuously for 1-2 hours and walk

continuously for up to 20 minutes. He was not currently on a stretching program as it seemed to

exacerbate his symptoms. Mr. Wert reported that hot packs, ultrasound, ice, massage, and electrical

stimulation had minimal or temporary impact. He told Dr. Goldman that there was a significant

history of Charcot-Marie-Tooth syndrome in his family.  Mr. Wert reported disrupted sleep and no

sexual dysfunction.  (Id.)  On physical examination Dr. Goldman wrote:

> the patient presents as a well developed, well nourished male who appears to be
> moderately overweight.  Pain behaviors are mild to moderate and slightly more than
> would be expected per objective findings.

(Id.)  Dr. Goldman could not elicit any deep tendon reflexes in the lower extremities, and Mr. Wert

said that had been longstanding and attributed it to his Charcot-Marie-Tooth disease.

> Dr. Goldman stated his impressions as follows:
>
> 1. Lumbosacral spondylosis,[16] pre-existing to and aggravated by work related injury
> November 10, 2003.
> 2.  Status post L2-3 laminectomy (times 2?), pre-existing and unrelated to
> November 10, 2003 work related injury.
> 3.  Charcot-Marie-Tooth syndrome, unrelated to the November 10, 2003 work
> related injury.
> 4.  Subchronic lumbosacral strain secondary to November 10, 2003 work related
> injury.
> 5.  Truncal deconditioning.
> 6.  Sacroiliac joint dysfunction, most likely pre-existing, but aggravated by
> November 10, 2003 work related injury.
> 7. L5 spondylolysis, pre-existing and unrelated to November 10, 2003 work related
> injury.
> 8. History of arrhythmia with evidence of hypertension - not work related.

(Id.)  Dr. Goldman discussed the options with Mr. Wert:

> doing nothing (unacceptable to the patient, as well as to myself), proceeding with
> lumbar fusion for which the patient, Dr. Wong and I, as well as Dr. Bisgard all
> acknowledged will probably not allow him to return back to his former job very
> readily, nor will it necessarily improve his function, versus more comprehensive and
> aggressive rehabilitation, which clearly will involve a certain amount of substantial
> discomfort.  However, the latter option seems to be our only tangible one at this point
> and it was explained to the patient the rationale for taking a more comprehensive
> approach to his rehabilitation.

---

[16]Ankylosis (stiffness or fixation of a joint by disease or surgery) of the vertebra; often
applied nonspecifically to any lesion of the spine of a degenerative nature.

(Id.)  Dr. Goldman reinstituted physical therapy three times per week for three weeks with cardiac,

hypertension and Charcot-Marie-Tooth precautions.  If symptoms and function did not improve, Dr.

Goldman would reevaluate in three weeks and refer Mr. Wert to a more comprehensive

rehabilitation site with pool therapy.  (Id.)  Dr. Goldman felt it was reasonable to recommend light

work restrictions with 20-25 pound maximum lifting and standing no more than 15 minutes out of

every half hour.   Mr. Wert and Dr. Bisgard informed him, however, that "it is pretty much

impossible to accommodate this recommended restriction since sometimes the patient needs to pitch

in at the plant in which he works and provide heavy work in a pinch, particularly during power

surges and black outs."  (Id.)  Dr. Goldman referred Mr. Wert to Dr. Floyd Ring for consideration

of transforaminal epidural steroid injections at L2-3, as well as facet blocks.  (Id.)

After all of Dr. Goldman's suggestions were tried and Mr. Wert continued to complain of

back pain, Dr. Goldman referred Mr. Wert to Dr. John Barker, an orthopedic surgeon.  Dr. Barker

practices in the Rocky Mountain Spine Clinic with three or four other orthopedic surgeons.  At the

time Mr. Wert first saw Dr. Barker on March 8, 2004, (Pl. Ex. 4), Dr. Barker had been operating on

his own less than three years, and he was not yet board certified in orthopedic surgery, attaining that

distinction in 2005.  (Def. Ex. 7, Barker curriculum vitae at 1-2.)  Dr. Barker noted that various

therapies had been attempted to ease Mr. Wert's pain without success, and that Mr. Wert was then

taking OxyContin 10 mg. for pain two to three times a day.  Dr. Barker reported Mr. Wert was

"miserable."  (Pl. Ex. 4.)

Dr. Barker examined Mr. Wert and reviewed reports of AP and lateral x-rays of the lumbar

spine and an MRI of the spine.  It is not clear from Dr. Barker's progress notes whether these x-rays

and the MRI scan were new tests he ordered or whether they were previously obtained by other

physicians.  Dr. Barker testified at his proof deposition that he did not look at any x-rays or MRI

scans or reports of any such tests taken before Mr. Wert's fall on November 10, 2003, because they were not relevant to his decision-making. Thus, the Court finds that Dr. Barker did not review or consider any of the medical records related to Dr. Wong's two earlier surgeries on Mr. Wert. During his first examination of Mr. Wert, Dr. Barker observed:

> AP and lateral x-rays of his lumbar spine were reviewed. On the AP he has degenerative scoliosis from L1 to L5. He has some lateral listhesis of L3 on L2. On the lateral x-ray he has severe degenerative disc disease with marked disc space collapse at L2-3 and early degenerative disc disease at L3-4. MRI of his lumbar spine reveals obviously degenerative disease severe at 2-3, at 3-4 he has disc desiccation, 4-5 is mildly desiccated as is the L1-2, and 5-1 looks fairly well preserved. He has foraminal stenosis severely at L2-3 and L3-4 with mild to moderate stenosis at 4-5 and 5-1.
>
> IMPRESSION:
> 1. Degenerative lumbar scoliosis;
> 2. Lumbar stenosis;
> 3. Lumbar degenerative disc disease;
> 4. Lumbar spondylosis.

(Id.) Dr. Barker testified that he was unaware of any trauma that could cause a degenerative scoliosis in and of itself, and he was also unaware of any trauma that could cause a lumbar spinal stenosis other than a burst fracture, which he did not observe in Mr. Wert. Dr. Barker also could not tell whether the spondylolysis was caused by degeneration or trauma.

Mr. Wert told Dr. Barker that he was interested in surgical intervention in April 2004 because he had failed non-operative measures. Dr. Barker discussed surgical options with Mr. Wert and his wife, including fusion from T12 to S1 to incorporate the entire scoliosis, which Dr. Barker stated "would be a huge surgical undertaking[,]" or short fusion from L2 to L4, trying to correct scoliosis as much as possible through those two levels. Dr. Barker ordered discograms to be sure that the L1-2 and L4-5 discs were not causing any pain, and if those tests were negative, he would

consider an L2-L4 fusion. Dr. Barker noted that Mr. Wert "recognizes that this may break down if we can't completely correct the scoliosis." (Id.)

On April 26, 2004, Dr. Andrew Williams conducted a physical of Mr. Wert in preparation for the surgery to be performed by Dr. Barker. In his notes, Dr. Williams referred to "the motor vehicle accident which worsened his back to its current situation[.]" (Def. Ex. 22.) At trial the Werts denied that Mr. Wert had been in any car accident. Although this discrepancy raises some concern in the Court's mind due to other questions which have arisen about Mr. Wert's credibility, there is no evidence from which the Court can determine that such an accident did or did not occur.

On March 10, 2004, Mr. Wert underwent a psychological evaluation by Lance La Certe, Psy.D., to determine whether Mr. Wert had any untreated depression, to clear him for long-term use of pain medications, and to determine the presence of any psychological contraindications for lumbar surgery. (Pl. Ex. 22.) Mr. Wert described his symptoms and his pain level. Mr. Wert told Dr. La Certe that he was diagnosed with Charcot-Marie-Tooth syndrome in 2002 and, "[a]lthough he had to be somewhat careful with ambulation, especially on unsteady ground[,]" he worked 12-hour days and had not missed any work since his last back surgery. (Id.) Mr. Wert also reported that he had had chronic numbness/analgesia in his ankles and feet long before his November 10, 2003 fall. (Id.) Dr. La Certe found Mr. Wert to be "emotionally robust" and cleared him for spinal surgery. He observed that Mr. Wert "was also very objective about understanding that, given two previous surgeries, there is no guarantee that additional surgery will 'cure' his current claims related pain. He has already considered the possibility that he may have to retire after 30 years of service with the energy company. He seems to be psychologically prepared for this possibility. This attitude is yet another positive indicator of his emotional resiliency." (Id.)

25

Mr. Wert returned to Dr. Goldman on March 26, 2004 for overall case management and medication management. (Pl. Ex. 24.) Mr. Wert reported that he was committed to the upcoming surgery by Dr. Barker, but he was anxious about potential complications. Dr. Goldman discussed the risks and benefits of the surgery, including the risks for retrograde ejaculation and impotence. He and Dr. Bisgard agreed that Mr. Wert had more than a thirty percent (30%) chance of getting some improvement in activities of daily living and some modest pain relief, although it might take one to two years after surgery to see the optimal benefit. (Id.) Dr. Goldman noted he and Dr. Bisgard agreed with Dr. La Certe's conclusion that Mr. Wert was "emotionally robust."

The discography obtained on April 1, 2004 was positive at L1-2 and negative at L4-5. (Id. at 5-6.) Dr. Barker met with Mr. Wert again on April 26, 2004 and informed him that, due to the discography result, any surgery would have to include three levels from L1-L4. Dr. Barker told Mr. Wert he wanted to look at the MRI again in case conference with his partners and if there should be a change in the level of the fusion after the case conference, he would contact Mr. Wert. (Id.)

At the case conference on April 28, 2004 (Pl. Ex. 25), Doctors Odom, Jamrich, Otte and Girod all looked at the films. Dr. Otte pointed out that "he has a spondylolysis[17] at L5, which in retrospect you can see on the L5 pars bilaterally. He has stenosis foraminally at 4-5." (Id.) Dr. Barker testified that he missed the pars defect at L5 bilaterally (a fracture in the bone between the superior and inferior facet), and he appreciated Dr. Otte "birddogging" him prior to surgery. The pars defect made L5 unstable. Dr. Barker testified that doing a fusion from L1 to L4 on top of a spondylolysis at L5 with a grade 5 degenerative disk at 4-5 is doomed to failure. The levels at L4-5

---

[17] Degeneration or deficient development of a portion of the vertebra; commonly involves the pars interarticularis, which can result in a spondylolisthesis.

26

and 5-1 were also included in the planned fusion.  (Id.)  Dr. Jamrich pointed out that "T12 is wedged."  (Pl. Ex. 25.)  Dr. Barker wrote:

> We probably need to do an L1-S1 to address his stenosis.  Stopping at L4 would not be a good idea with his lower extremity symptoms as well as the spondylolysis at L5. Because of his wedged vertebra at T12, there is a high likelihood that if we stopped at 1 he would fall off with kyphosis[18] at the 12-1 junction.  Thus, we should probably extend it up to T11, which is obviously a much bigger surgery than we had previously talked about.

(Id.)

On May 7, 2004, Dr. Barker performed extensive surgery on Mr. Wert.  First, he performed a front ALIF, which stands for anterior lumbar interbody fusion.  Dr. Barker made an abdominal incision and removed three discs, decorticated the endplates (roughed up the bone so that it would bleed and heal), and inserted cages in place of the discs.  These cages were filled with Mr. Wert's own bone grafts and bone morphogenic protein ("BMP").  Dr. Barker then turned Mr. Wert to the prone position, opened his back, and performed an L1 to S1 instrumentation, decompression.  From the back, Dr. Barker removed the discs from L1-2 and 2-3 and inserted cages with bone grafts and BMP.  Rods and screws were placed along Mr. Wert's spine from T12 to S1 and into the pelvis.

Mr. Wert was hospitalized for seven days.  He testified he took so much narcotic pain medication that he did not know he was in the hospital.  When he went home, he could not care for himself in any way, and his wife did everything for him, including assisting him with bathing and toileting.  The two previous surgeries by Dr. Wong required Mr. Wert to remain in the hospital overnight, and the pain associated with those surgeries was minimal compared to the pain Mr. Wert experienced following his surgery with Dr. Barker.  Mr. Wert continued to take narcotic prescription pain medication at home for months, he used an external stimulator to promote bone healing, he was

---

[18]Exaggerated outward curvature of the thoracic region of the spinal column resulting in a rounded upper back.

required to use a back brace for three to six months, and he required a walker or cane to ambulate.

According to Dr. Barker, this was "quite a big surgery," and it took Mr. Wert a lot of time to recover. Dr. Barker testified generally about the kinds of restrictions he places on his patients following back surgery. Postoperatively, the restrictions are no bending, twisting or lifting greater than 15 pounds. X-rays are obtained at two weeks, six weeks, and three months. At three months, if the x-rays look good, sometimes Dr. Barker allows his patients to bend and twist a little, and he may increase the weight restriction to 20 pounds. At six months, depending on the status of healing shown by x-ray, the weight restriction may be increased to 30 to 35 pounds with more bending and twisting. Dr. Barker also directed Mr. Wert to walk up to two to three miles per day. Dr. Barker and Dr. Bisgard decided that Mr. Wert would not return to work.

Mr. Wert started taking physical therapy six to seven months after the surgery, and these treatments continued for at least a year. The more physically active he became, however, the more pain he had. About a year after the surgery, Dr. Barker ordered a CT scan which revealed a pseudarthrosis, which means the bone did not heal at L5-S1 and L1-2. According to Dr. Barker, these are the most likely areas for bone not to heal. Dr. Barker operated on Mr. Wert from the back a second time on August 24, 2005, to repair the areas that did not heal. Because the bone did not heal properly, the rods and screws created larger holes in the bone where the screws were placed. Therefore, Dr. Barker took out the previous hardware and put in screws that were the same length but larger in diameter. Mr. Wert was in the hospital five days and experienced considerable pain with the second surgery. Dr. Barker placed Mr. Wert under the same restrictions as after the first surgery. Again, JoAnn Wert was required to care for her husband. Mr. Wert took narcotic prescription pain medication, used an external stimulator, and wore a clamshell back brace for three to six months anytime he was not in bed. Eventually he was able to take physical therapy

28

treatments.      Mr. Wert testified at trial that he hunted elk in December 2005.  (Trial Tr. at 171.)

If this is true, Mr. Wert would have been elk hunting less than five months after Dr. Barker

performed the second back surgery on August 24, 2005.  Either Mr. Wert was confused about the

date he went elk hunting, or he has not been truthful about the extent of his problems following his

major back surgeries with Dr. Barker.  Even if he was confused about the date he went elk hunting,

it is surprising to the Court that Mr. Wert would be able to elk hunt at all given his recitation at trial

about his back pain and his physical limitations following his last two back surgeries, which required

him to give up many activities, including hunting and fishing.

       In January 2006, Mr. Wert felt a pop in his back when he was bending over.  An x-ray

showed that the hardware was in its proper place.  Dr. Barker thought Mr. Wert may have pulled a

muscle and directed him to resume stretching and strengthening exercises.  (Pl. Ex. 5.)  By the time

of trial Mr. Wert was feeling better and moving around better.

       Dr. Barker testified he was not aware until this litigation and certain documents were shown

to him that Dr. Wong opined that Mr. Wert was not a good surgical candidate.  Dr. Barker further

testified that Mr. Wert would not be a good surgical candidate in Dr. Wong's practice because Dr.

Wong does not perform more than a one- or two-level fusion in his practice, and Dr. Barker

performed a five-level fusion on Mr. Wert.

       As part of this litigation, Dr. Barker reviewed the radiologist's report of the MRI taken of

Mr. Wert's back on November 15, 2002 and the MRI scan taken in 2003 and compared the two.  Dr.

Barker did not review the MRI scan of November 15, 2002.  According to Dr. Barker, the pars

defect at L-5 bilaterally was not noted on the report of the 2002 MRI, but was noted in the report

and the films from 2003.  The 2002 MRI report indicated well-maintained disk spaces with no loss

of signal and no herniation, bulge, or stenosis, and after the November 10, 2003 fall, the MRI

showed disk protrusions at L2-L3, L4-5 and L5-S1. Dr. Barker felt that his own interpretation of the MRI scan of 2003 was consistent with the radiologist's report of that scan.

According to Dr. Barker, Mr. Wert had preexisting conditions of degenerative disk disease, spondylosis and stenosis, and a person with those conditions is more likely to have pain following a fall. Dr. Barker provided his opinion, based on a reasonable degree of medical certainty, that it was more probable than not that the fall permanently aggravated or exacerbated Mr. Wert's degenerative disk disease, lumbar stenosis, and lumbar spondylosis. Dr. Barker was not able, to a reasonable degree of medical certainty, to quantify the level of aggravation or exacerbation. Dr. Barker based his opinion as to exacerbation on Mr. Wert's statements that he was doing fairly well in 2003 before the fall. If Mr. Wert actually was experiencing pain in 2003 after his two surgeries with Dr. Wong, then Dr. Barker testified the degree of exacerbation caused by the November 2003 fall would change.

Dr. Barker testified at his proof deposition that he could not state to a reasonable degree of medical certainty whether Mr. Wert's conditions were caused solely by trauma. Dr. Barker also testified it is possible that the natural history of degenerative disk disease, scoliosis, and stenosis might have required Mr. Wert to have surgery in the future even if the November 10, 2003 fall had not taken place.

At the time of his discovery deposition, Dr. Barker could not state to a reasonable degree of medical certainty that the fall was the cause of Mr. Wert's back condition as he observed it in March 2004. But at his proof deposition, after comparing the November 2002 MRI report and the 2003 MRI scan, Dr. Barker gave his opinion to a reasonable degree of medical certainty that the fall more probably than not was the cause of Mr. Wert's overall back condition as he observed it in March 2004 and this led to Mr. Wert's inability to work full-time.

30

The Court finds that the medical evidence shows there existed a pars defect at L-5 of Mr. Wert's vertebra which was clearly apparent on x-rays and MRIs taken between 2000 and 2002. Dr. Wong and Dr. Saari relied on those x-rays and MRI scans showing the pars defect at L-5 in formulating their treatment plans for Mr. Wert. According to Dr. Spengler, the defect is evident in the MRI scan taken by Dr. Wong in October of 2002. Had Dr. Barker reviewed the 2002 MRI scan itself or any of the prior x-rays and scans taken of Mr. Wert's back before 2002, Dr. Barker himself likely would have observed the pars defect at L-5 bilaterally, just as it was observed at the time of prior treatment by Dr. Wong and in Dr. Spengler's evaluation of this case for purposes of trial, which the Court will discuss in more detail below. The Court further finds that, had Dr. Barker made an observation of the longstanding nature of the pars defect at L-5 bilaterally since 2000, such an observation likely would have changed his opinion that the pars defect at L-5 appeared only on the MRI scan taken shortly after Mr. Wert's November 10, 2003 fall at La Quinta Inn and not on any prior x-ray or MRI scan.

Dr. Barker testified Mr. Wert may have future potential problems with adjacent level disease at T12-L1, T11-T12, and T10-T11, he may develop sacroiliac joint pain, and he will always have residual back pain due to muscular scar tissue arising from his two major spine surgeries with Dr. Barker and two surgeries with Dr. Wong. Mr. Wert's options for future treatment include physical therapy, medications, injections, and possibly another surgery.

Dr. Bisgard is a specialist in occupational medicine, which concerns the diagnosis, treatment and prevention of work-related injuries and illnesses. She is the designated provider for Xcel Energy, Mr. Wert's employer. Dr. Bisgard is Level II accredited in the Colorado Division of Workers' Compensation, and she has training and certification to perform independent medical examinations ("IMEs") and to render opinions in specific causality assessment. The Court

previously discussed Dr. Bisgard's qualifications in a Memorandum and Order entered on August 15, 2007 (Docket Entry Nos. 97 & 98), and the reader is referred to that prior decision. Dr. Bisgard is not an orthopedic surgeon nor is she trained in orthopedics. The Court finds, however, that she is qualified by education, training, and experience to render an opinion about the causation of back injuries or back pain. Dr. Bisgard has testified previously in numerous cases about causation issues.

Dr. Bisgard did not review any of Mr. Wert's pre-November 10, 2003 x-ray films or MRI scans, but she reviewed the reports. She reviewed the x-rays Dr. Saari took on November 17, 2003, and she had Dr. Wong's records. Like Dr. Wong, Dr. Bisgard initially diagnosed a lumbar sprain or strain as a result of Mr. Wert's fall at the La Quinta Inn.

When Mr. Wert continued to complain of pain, Dr. Bisgard worked with Dr. Goldman to treat Mr. Wert conservatively without success. At that point, Dr. Bisgard referred Mr. Wert to Dr. Barker. Drs. Bisgard and Goldman both knew that Dr. Wong's practice did not include multiple-level fusion surgeries for degenerative disease, so they did not send Mr. Wert back there for further evaluation or treatment. Dr. Bisgard and Dr. Goldman believed that Mr. Wert needed back surgery, and they referred him to Dr. Barker, who agreed that Mr. Wert probably needed surgery to get any kind of quality of life. Dr. Bisgard communicated with Dr. Barker about the first surgery, but she did not attend the case conference. After the surgery, Dr. Bisgard worked closely with Dr. Goldman and Dr. Barker on a monthly basis to address Mr. Wert's rehabilitation and his medication management. She had 36 office visits with Mr. Wert over three years.

In Dr. Bisgard's view, Mr. Wert's prognosis is guarded because he has significant back pain even after two extensive surgeries and three years of therapy. In the future he may need a spinal implant or an infusion pump. Dr. Bisgard calculated that Mr. Wert has a total thirty-two percent (32%) impairment rating of the whole person. Yet, there is indication in the record that, as of

32

February 28, 2003, Mr. Wert's "% of Functional Impairment" was greater than forty percent (40%) before the fall on November 10, 2003.  (Def. Ex. 24.)

In Dr. Bisgard's opinion, to a reasonable degree of medical certainty, it is more probable than not that the November 10, 2003 fall at the La Quinta Inn permanently aggravated Mr. Wert's degenerative disk disease, scoliosis, lumbar stenosis, and lumbar spondylosis.  In her opinion, within a reasonable degree of medical certainty, had it not been for the fall, Mr. Wert would not have needed the surgery or treatment that was rendered.

Mr. Wert testified that he cannot twist or bend.  He can sit or stand, but not for long periods of time.  He takes two to five Percocet tablets a day and suffers from some depression and anxiety.  On the one hand, he testified he gave up activities such as ATV riding, boating, camping, and hunting and fishing, yet he also admitted that he hunted elk in December 2005.  He walks about one and a quarter miles twice per week with a cane.   Some days he is able to drive some distance and other days he is not.  As a complication of the last two back surgeries, Mr. Wert is unable to have a sexual relationship with his wife.  At trial Mr. Wert testified that he had intended to work to age 65, although he admitted at his discovery deposition that he had wanted to retire earlier, having worked over thirty years and "paid his dues."

Mrs. Wert testified that she worked outside the home until Dr. Barker operated on Mr. Wert the first time.  Because Mr. Wert is no longer as physically active as he once was, the couple no longer goes dancing, bowling, hiking, swimming or snow skiing.  They sold their boat, motorcycle, and ATV.  They are unable to have a sexual relationship.  For many months she was required to do all of the cooking and the household chores, whereas Mr. Wert used to do half of the chores.  He is now able to do some of the household chores.  For many months after the fall at La Quinta, Mr. Wert

33

did not go to any family social activities due to pain, and Mrs. Wert was required to go alone. Their lives revolved around doctor visits and physical therapy.

Mrs. Wert handles the couple's finances and testified that before the fall at La Quinta Inn, Mr. Wert was paid once a month by a direct deposit of $5500 to $6000 per month. He also received a bonus each spring which varied from $2000 to $6000. The Werts file joint income tax returns and reported $88,000 in income in 2002 and $74,000 in income in 2003. Because Mr. Wert receives sixty percent of his salary and she is not working, finances are difficult for them. They have used their savings and dipped into their 401(k) account.

Defendant's expert, Dr. Dan Spengler, is Professor and Chairman of the Department of Orthopaedics and Rehabilitation at Vanderbilt University Hospital since July 1983. (Def. Ex. 34.) He is Chief of Staff at Vanderbilt and President of the American Orthopaedic Association. Dr. Spengler has extensive professional qualifications in the treatment of spinal conditions in patients spanning thirty years. Dr. Spengler is an orthopaedic surgeon who has performed many spinal operations. He is very familiar with the spinal conditions and procedures discussed by all of the doctors who treated Mr. Wert. Dr. Spengler reviewed three volumes of medical records about Mr. Wert, including all of the MRI scans and plain radiographs, and he reviewed a number of depositions. Dr. Spengler is the only physician who has personally viewed and compared all of the MRI scans and x-rays taken of Mr. Wert's back.

At trial, Dr. Spengler reviewed Dr. Barker's March 8, 2004 impressions, or working diagnoses. He explained that "discogenic pain at the L1-2" reflects the perceived location of the pain. "Scoliosis" is a term that references spinal deformity in the coronal plane, so that if one looks at a person headon, the spine is a bit curved, and there can be various degrees of curvature. "Lumbar stenosis" implies that the thecal sac or the cauda equina, the sac of nerves that runs through the

34

spinal canal, is being compressed; in other words, it is like having a napkin ring around the nerves and the canal is narrowed. "Lumbar spondylosis" is a generic term meaning arthritis of the spine. A "bilateral pars defect at the L5" is a defect between two facet joints, the superior and inferior facets. It refers to a specific area of the back portion of the vertebra. Lumbar spondylolysis arises from acquired activities in teenage years, so it is prevalent in high school athletes and female gymnasts. Dr. Spengler testified that a fall in the shower would not cause any of these five conditions as noted by Dr. Barker.

In looking at the December 8, 2003 MRI scan, (Def. Ex. 35), taken after Mr. Wert fell at the La Quinta Inn, Dr. Spengler pointed out a slight curvature to Mr. Wert's spine referred to as degenerative, rather than idiopathic, scoliosis. He also pointed out the narrowing of the vertebral canal, or spinal stenosis. As to lumbar spondylosis, there is no change that he could point to on the MRI scan because the term refers to arthritis of the spine, which is present in virtually everyone over the age of 25. Dr. Spengler did not see spondylolysis on the MRI images. He identified scar tissue at L2-3/L3-4 where Dr. Wong performed the 2002 surgeries.

Dr. Spengler then looked at the MRI scan taken on November 15, 2002 (Def. Ex. 36), about one year before Mr. Wert's fall at La Quinta Inn. In comparing the two MRI scans (pre-fall November 2002 and post-fall December 2003), Dr. Spengler found no significant difference between them.

Defense counsel then asked Dr. Spengler to review the December 8, 2003 MRI report (Def. Ex. 37), which included the phrase "bilateral L5 pars defect without associated anterolisthesis. There may be fibrous union at this level." Dr. Spengler explained that "fibrous union" is a descriptive term used for something that is longstanding where there has been an effort on the part

of the body to heal it. The point of the term is that the condition is longstanding, and one could comfortably opine that the condition preceded any fall just a few days before the MRI scan.

Dr. Spengler reviewed Dr. Wong's November 27, 2002 operative notes of the second surgery he performed on Mr. Wert (Def. Ex. 38), and Dr. Spengler did not find any mention of a repair of spondylolysis. He also examined Dr. Wong's January 28, 2002 operative notes of the first surgery (Def. Ex. 39) and found no statement about a repair of spondylolysis.

Dr. Spengler then reviewed a November 28, 2000 report of plain radiographs of the lumbar spine, prepared by Dr. Alan Rothberg (Def. Ex. 40). According to Dr. Spengler, this is a better imaging study to identify spondylolysis. In this report, the radiologist concluded that there was evidence of bilateral spondylolysis at L5, with associated degenerative changes. Dr. Spengler opined that the report was very consistent with the 2003 MRI report in which the radiologist mentioned fibrous union. It establishes the fact that the spondylolysis pre-existed Mr. Wert's fall in November 2003.

Dr. Spengler next reviewed an MRI report dated May 17, 2005, after Dr. Barker operated on Mr. Wert the first time. (Def. Ex. 41.) The report established again the identification of bilateral L5 spondylolysis, still present after Dr. Barker operated. According to Dr. Spengler, it is not a condition that a doctor would normally operate on for the procedure Mr. Wert had.

Dr. Goldman's impression on January 7, 2004 of "L5 spondylolysis, pre-existing and unrelated to November 10, 2003 work related injury" (Def. Ex. 42), is very consistent and Dr. Spengler agreed with Dr. Goldman's impression. Dr. Spengler also pointed out that Dr. Goldman found two of five Waddell's signs positive, which indicated Mr. Wert at that time was a bit apprehensive and probably had some symptom amplification. Dr. Goldman's comment of mild to

36

moderate pain behavior "slightly more than would be expected per objective findings" confirmed "what Waddell two over five would mean."

In looking at the x-rays taken on November 17, 2003, (Def. Ex. 43), seven days after Mr. Wert fell at La Quinta Inn, Dr. Spengler could not identify any evidence of trauma. Assuming that a fall occurred, it was Dr. Spengler's opinion that the fall did not cause any of Mr. Wert's back conditions. Dr. Spengler testified: "I think anytime someone has a fall, whatever, you are going to have a temporary exacerbation of some symptoms, some discomfort and so forth. And with the energy level estimated here, you would expect it to pretty much go away in a couple of months, max." (Trial Tr. at 241.) Dr. Spengler agreed with Dr. Wong's assessment on December 9, 2003, that there was no evidence of fracture, dislocation, or other major traumatic abnormality, and that Mr. Wert likely suffered a lumbar sprain/strain in the November 10, 2003 fall. One who falls and sustains a very significant musculoskeletal injury has severe pain at 9 or 10 out of 10, depending on the person. Over-the-counter Tylenol would be very unlikely to suppress the pain of an acute trauma requiring a fusion, nor could a person sit at a conference for two and one-half days.

Dr. Spengler characterized the multi-level fusion done by Dr. Barker as elective, not emergent or urgent. In looking at the May 24, 2004 x-rays taken after the fusion (Def. Ex. 43), he described the procedure as a very major lumbar spinal procedure that crossed over into the sacrum, with rods on both sides of the spine, and thirteen pedicle screws with associated crosslinks. The hardware extended below the last vertebral body into the ilium, "which adds to the procedure a great deal, as well, in terms of immobilization and that sort of thing." (Trial Tr. at 244.) In Dr. Spengler's opinion, Mr. Wert did not need such an extensive fusion as a result of falling in the shower at La Quinta Inn.

Dr. Spengler did not examine Mr. Wert, nor did he contact any of the doctors who treated Mr. Wert.  He agreed that physicians can come to different conclusions regarding a medical issue acting in good faith, and he agreed that seven doctors had reviewed Mr. Wert's case and determined that spinal fusion was appropriate and necessary.   Dr. Spengler agreed that it would be improper for an orthopedic surgeon to do a procedure unless he was competent to do so, and it would not be a breach of the standard of care to do surgery on someone like Mr. Wert.  Other than the statements in Dr. Goldman's notes, Dr. Spengler did not know of any secondary gain issues Mr. Wert might have.  He testified it was appropriate for Dr. Barker to obtain the psychological evaluation done by Dr. La Certe, and Dr. Spengler would give it great weight.  Dr. Spengler agreed "there was a transient aggravation by the fall."  (Trial Tr. at 260.)

## II. CONCLUSIONS OF LAW

To prevail on a negligence claim, a plaintiff must prove five elements: "(1) a duty of care owed by the defendant to the plaintiff; (2) conduct by the defendant falling below the standard of care amounting to a breach of the duty; (3) an injury or loss; (4) causation in fact; and (5) proximate causation."  Rice v. Sabir, 979 S.W.2d 305, 308 (Tenn. 1998).

Whether a duty exists is a question of law for the Court.  Id.  "Duty of care has been defined by the courts as 'the legal obligation owed by defendant to plaintiff to conform to a reasonable person standard of care for protection against unreasonable risks of harm.'"  Patterson-Khoury v. Wilson World Hotel-Cherry Road, Inc., 139 S.W.3d 281, 285 (Tenn. Ct. App. 2003).  If the defendant fails to exercise reasonable care, he breaches his duty to the plaintiff.  Id.

Ordinary or reasonable care is estimated by the risk entailed through probable dangers attending the particular situation and is to be commensurate with the risk of injury.  Id.  An innkeeper owes to his guests at all times the duty to maintain the premises in a reasonably safe

38

condition and of exercising ordinary or reasonable care to protect guests while they are in the hotel from personal injury through the innkeeper's negligence. Kandrach v. Chrisman, 473 S.W.2d 193, 195 (Tenn. Ct. App. 1971). "A land owner owes invitees a duty to exercise ordinary care to protect them from not only those risks of which the owner is actually aware, but also those risks of which the owner should be aware after reasonable inspection." Motel 6 G.P., Inc. v. Lopez, 929 S.W.2d 1, 3 (Tex. 1996). To prevail on a premises liability claim against La Quinta Inn, the Werts must prove (1) that La Quinta Inn had actual or constructive knowledge of some condition on the premises; (2) that the condition posed an unreasonable risk of harm; (3) that La Quinta Inn did not exercise reasonable care to reduce or eliminate the risk; and (4) that La Quinta Inn's failure to use reasonable care proximately caused the Werts' injuries. See id. at 4. The Court concludes that La Quinta Inn had a legal duty to exercise reasonable care to keep its premises in a reasonably safe condition and to protect guests, including the Werts, from foreseeable harm. Such duty included the responsibility to either remove or warn against any latent or hidden dangerous condition on the premises of which the hotel was aware or should have been aware through the exercise of reasonable diligence. Eaton v. McLain, 891 S.W.2d 587, 594 (Tenn.1994).

The evidence shows that, under La Quinta Inn's own policies, the hotel staff, particularly housekeeping and maintenance, had a responsibility to check guest rooms for dangerous or defective conditions on a daily basis and to notify the General Manager, Ms. Luiz, promptly of any such unsafe condition identified. Ms. Luiz testified that a cracked fiberglass shower stall in a guest room is the type of dangerous or defective condition that should have been reported to her. She further testified that, had she known about the cracked shower floor, she would have ordered the shower replaced, not repaired. While Ms. Luiz did not have actual notice that a repair of the shower floor had been attempted, members of her maintenance and housekeeping staff did have actual notice of

the cracked condition of the shower stall floor. Such a dangerous or defective condition foreseeably could cause harm to a guest who might fall in the shower if the weakened fiberglass cracked further. Instead of notifying Ms. Luiz that the shower in Room 144 needed attention, patch or caulking material was placed over at least part of the crack and the bath mat was returned to the shower floor over the crack and repair, hiding it from the view of guests. Based on these circumstances, the Court concludes that La Quinta Inn owed the Werts a duty to act with reasonable care, and the Court finds that La Quinta Inn breached its duty to act with reasonable care when La Quinta Inn did not exercise reasonable care to reduce or eliminate the risk of harm.

Critical in the Court's negligence analysis is whether the Plaintiffs have proved by a preponderance of the evidence the elements of causation in fact and proximate cause. Causation and proximate cause are distinct elements of a negligence claim and the Plaintiffs must prove both by a preponderance of the evidence. See Kilpatrick v. Bryant, 868 S.W.2d 594, 598 (Tenn. 1993). "Causation, or cause in fact, means that the injury or harm would not have occurred 'but for' the defendants' negligent conduct." Id. "Once it is established that the defendant's negligent conduct was, in point of fact, the actual cause of the plaintiff's injury or harm, the focus then becomes whether the policy of the law will extend responsibility for that negligent conduct to the consequences that have occurred." Id. While the Court has found that Mr. Wert was affected by his Charcot-Marie-Tooth syndrome and that the condition contributed to his fall at the La Quinta Inn, the Court finds that Mr. Wert would not have fallen in the shower but for the cracking of the fiberglass floor underneath his right foot, as shown on the photographs taken by Mrs. Wert. Thus, Plaintiffs have proved that the hotel's breach of duty was the cause in fact of Mr. Wert's fall.

Plaintiffs contend that Mr. Wert's fall in the shower at La Quinta Inn permanently aggravated his pre-existing back conditions, including degenerative lumbar scoliosis, lumbar stenosis, lumbar

degenerative disk disease, and lumbar spondylosis. Under Tennessee law, "[a] person who has a condition or disability at the time of an injury is not entitled to recover damages therefor. However, he is entitled to recover damages for any aggravation of such pre-existing condition or disability proximately resulting from the injury." Haws v. Bullock, 592 S.W.2d 588, 590 -591 (Tenn. Ct. App. 1979) (quoting Tennessee Pattern Jury Instruction § 14.08). Further, "[w]here a pre-existing condition or disability is so aggravated, the damages as to such condition or disability are limited to the additional injury or harm caused by the aggravation." Id. "However, if the pre-existing condition caused no harm or disability before the accident, the defendant is responsible for all the harm or disability caused by the accident even though it is greater because of the pre-existing condition than it might otherwise have been." Id. See also Kincaid v. Lyerla, 680 S.W.2d 471, 473 (Tenn. Ct. App. 1984).

The Court concludes that Plaintiffs did not prove by a preponderance of the evidence that Mr. Wert's fall in the shower at the La Quinta Inn permanently aggravated his pre-existing back conditions. The evidence shows that, initially, Mr. Wert thought that he had only bruised himself after he fell in the shower at La Quinta Inn. He rated his pain immediately after the fall at 2-3 out of 10 and no more than 4 out of 10 throughout the week he stayed in Nashville and attended the conference at the Embassy Suites. Upon returning home to Colorado, Mr. Wert saw Dr. Saari, who took x-rays and prescribed a muscle relaxant. Dr. Bisgard initially diagnosed Mr. Wert with lumbar sprain or strain when she first saw him on November 17, 2003. Less than one month later, Dr. Wong also diagnosed lumbar sprain or strain without evidence of major traumatic abnormality as the result of Mr. Wert's fall at La Quinta Inn. Dr. Spengler agreed with these assessments, opining that Mr. Wert did not experience any fracture, dislocation, or other trauma and likely suffered a lumbar sprain or strain as a result of the fall. Dr. Spengler testified that Mr. Wert's MRI scans taken

41

before and after the November 10, 2003 fall showed no significant differences in his pre-existing back conditions.

When Mr. Wert continued to complain of back pain, Dr. Bisgard referred him to Dr. Goldman, a physiatrist, for additional conservative treatment. Dr. Goldman observed that Mr. Wert stated "[r]eclining is the main way to control his pain and flexion seems to be worse with extension by history, but on examination the opposite appears to be true." Also, Dr. Goldman observed mild to moderate pain behavior "slightly more than would be expected per objective findings." Dr. Spengler noted that Dr. Goldman's comment, considered in light of two of five Waddell's signs positive, indicated Mr. Wert was a bit apprehensive and probably had some symptom amplification.

The Court has identified many concerns about Mr. Wert's credibility. He has not been forthright with all of his medical providers, defense counsel, or the Court about important issues germane to this litigation. For example, the Court cannot trust Mr. Wert's testimony concerning his working hours in 2003; whether he fell in Branson and injured his back between the two surgeries performed by Dr. Wong; whether he had falls other than the one at La Quinta Inn that may have caused him injury and aggravated his pre-existing back conditions; or whether his symptoms were so bad on November 16, 2003 that he could not work his shift, or whether he actually went to a sporting goods store to shop that day. Physicians made observations that Mr. Wert's complaints of pain did not always match clinical findings on examination, suggesting that at times Mr. Wert may have amplified his symptoms. The Court itself must wonder if Mr. Wert suffered as much as he wants the Court to believe he did, particularly when he testified that he went elk hunting in December 2005 at a time when he and his surgeon, Dr. Barker, testified he would have been wearing a clamshell back brace after the second surgery in late August 2005. Because the Court must reject

42

much of Mr. Wert's testimony about his pain and physical limitations, the Court is left to consider the testimony of Dr. Barker, Dr. Bisgard, and Dr. Spengler.

Dr. Barker opined at his proof deposition that Mr. Wert's fall at La Quinta Inn permanently aggravated his pre-existing back conditions, but he was questioned on cross-examination about his discovery deposition, during which he testified he could not say to a reasonable degree of medical certainty that the fall permanently aggravated Mr. Wert's pre-existing degenerative back conditions. Dr. Barker was not able to quantify the extent of the aggravation or exacerbation.

The Court does not accept Dr. Barker's opinion on the issue of aggravation at his proof deposition for several reasons. At the time Dr. Barker first became involved in Mr. Wert's case, Dr. Barker was not a board certified orthopedic surgeon, he had been performing back surgeries less than three years on his own, and he did not have extensive experience in performing back surgeries and formulating opinions about causation. Dr. Barker did not personally view all of Mr. Wert's pre-fall x-ray films and MRI scans beginning in 2000. Dr. Barker performed two extensive back surgeries on Mr. Wert without even looking at the x-rays, MRI scans, and medical records generated before Mr. Wert's fall at La Quinta Inn. Dr. Barker did not review Dr. Wong's previous operative notes about the two surgeries he performed. Dr. Barker testified that none of these pre-fall x-rays, scans, and medical records were relevant to his decision making for surgery in 2004.

Dr. Barker looked at the pre-fall 2002 MRI report (not scan) only during this litigation, after his discovery deposition had been taken. After reviewing the 2002 MRI report, he opined at his proof deposition that he observed a pars defect at L-5 bilaterally on the 2003 post-fall MRI scan that was not mentioned in the 2002 MRI report. Dr. Barker relied on this difference to support his opinion that the November 2003 fall permanently aggravated Mr. Wert's pre-existing back conditions. If Dr. Barker had viewed the actual 2002 MRI scan, rather than the report, he might

have noticed that the pars defect at L-5 was apparent then and had been apparent on x-rays since 2000. The Court must also keep in mind that Dr. Barker admitted he did not notice the pars defect at L-5 when he reviewed the post-fall 2003 MRI scan in preparation for the extensive fusion surgery he performed on Mr. Wert. During case conference, Dr. Otte pointed out the pars defect at L-5, raising the substantial implication the existence of that defect had for the number of vertebral levels Dr. Barker would be required to fuse in Mr. Wert's back. Dr. Barker candidly conceded that he missed it, and he appreciated Dr. Otte "birddogging" him prior to surgery.

Additionally, Dr. Barker testified that his opinion on aggravation was partly based on Mr. Wert's statements that he was doing fairly well in 2003 before the fall, and that if Mr. Wert was actually experiencing pain in 2003 after his two surgeries with Dr. Wong, then his opinion would change. The evidence shows that Mr. Wert complained to Dr. Wong in February 2003 of back pain, rating it at 8 or 9 out of 10, with 10 being the worst. While Mr. Wert testified that he felt better in the later months of 2003, Dr. Barker's opinion on aggravation does not appear to account for Mr. Wert's complaints of continued strong back pain in early 2003 after Dr. Wong's two surgeries. Because the Court finds that Dr. Barker's opinion on causation likely would have changed had he correctly interpreted Mr. Wert's prior back x-rays and scans and taken into account Mr. Wert's continuing complaints of back pain in 2003, the Court gives less weight to Dr. Barker's opinion that the fall caused a permanent aggravation of Mr. Wert's pre-existing back conditions.

Dr. Bisgard also opined that Mr. Wert's fall at La Quinta Inn permanently aggravated his pre-existing back conditions, yet Dr. Bisgard initially diagnosed only a lumbar sprain or strain as a result of the fall. All of her information about the nature of the fall and the pain ensuing after it came from Mr. Wert, whom the Court has found is not entirely credible. Dr. Bisgard's role was to manage Mr. Wert's conservative treatment, including physical therapy and medication, in

44

conjunction with her referral to Dr. Goldman. Dr. Bisgard testified she had copies of Dr. Goldman's medical records; thus, she knew in reading them that there were some indications Mr. Wert might be amplifying his symptoms.

Moreover, though qualified to give opinions on causation, Dr. Bisgard is not an orthopaedic surgeon. The Court views her opinion through the lens of her training and experience, which is occupational medicine. She did not attend Dr. Barker's case conference prior to Mr. Wert's multi-level fusion in May 2004. Like Dr. Barker, Dr. Bisgard did not review any of the prior x-ray films or MRI scans taken of Mr. Wert's back before the fall. She did read the reports of those tests. The 2002 MRI report failed to mention the pars defect at L-5 which had been apparent on other films since 2000. Thus, like Dr. Barker, Dr. Bisgard relied at least in part on inaccurate information when she opined that the November 2003 fall permanently aggravated Mr. Wert's prior conditions. For these reasons, the Court gives little weight to Dr. Bisgard's opinion on causation.

Dr. Spengler's qualifications and experience in spinal conditions and surgeries far surpass the qualifications and experience of either Dr. Barker or Dr. Bisgard. Dr. Spengler was the only testifying expert in this case who reviewed all of Mr. Wert's pre-fall and post-fall x-ray films, MRI scans, reports and medical records. Upon his review he concluded that there were no significant differences between Mr. Wert's pre-fall 2002 MRI scan and his post-fall 2003 MRI scan. While Dr. Spengler briefly conceded on cross-examination that Mr. Wert may have experienced a "transient aggravation" of his pre-existing back conditions, the Court finds and concludes that Dr. Spengler's statement is consistent with his opinion given on direct that Dr. Wong and Dr. Bisgard initially had it right: Mr. Wert suffered only a transient lumbar sprain or strain as a result of his fall at the La Quinta Inn, and that he did not suffer a permanent aggravation of his pre-existing conditions, as the Werts allege. Moreover, Dr. Spengler opined that the conditions Mr. Wert had

45

before the fall were still present after the fall, and were even present after Dr. Barker operated on Mr. Wert twice in 2004 and 2005. Dr. Spengler characterized the multiple-level fusion performed by Dr. Barker as elective, not emergent or urgent. The Court gives greater weight to Dr. Spengler's opinion than Dr. Barker's or Dr. Bisgard's opinions because of his thirty years of outstanding experience as an orthopaedic surgeon, the fact that he is the only expert who reviewed all of the relevant medical scans and records, the fact that his opinion is consistent with that of Dr. Wong and the initial opinion of Dr. Bisgard, and the fact that his opinions are well-supported by all of the medical and other evidence in the record.

The Court concludes that the Werts have failed to prove by a preponderance of the evidence that Mr. Wert's fall at the La Quinta Inn on November 10, 2003 permanently aggravated his pre-existing back conditions. Because the Werts have not carried their burden of proof on liability, the Court will enter judgment in favor of Defendant La Quinta Inns, Inc., and against Plaintiffs Howard and JoAnn Wert.

An appropriate Order shall be entered.

ROBERT L. ECHOLS
UNITED STATES DISTRICT JUDGE